**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:21-cv-012 (WOB-CJS)**

**GEORGIA EUGENIA THOMAS**                                                **PLAINTIFF**

**VS.**                                   **MEMORANDUM OPINION AND ORDER**

**SOUTHERN HEALTH PARTNERS,
INC., ET AL.**                                                **DEFENDANTS**

This is a lawsuit brought by Georgia Thomas against Southern Health Partners, five members of its medical staff, and seven deputies at the Kenton County Detention Center for their alleged deliberate indifference to her serious medical need during her incarceration in early 2020.

Currently before the Court are Defendant Deputies Michaela Bone, Katelyn Bradford, Anissa Earl, Glenna Knight, Lakin Matthews,[1] Jeanette Molen, and Tatiana Robinson's[2] (collectively the "Deputy Defendants") Motion for Summary Judgment, (Doc. 83), Defendants Southern Health Partners, Inc., Dr. David Suetholz, and Nurses Christine Troendle, James Todd Collins, Shawnee Thoman, and Caitlin Brand's (collectively the "SHP Defendants") Motion for Summary Judgment, (Doc. 98), and the parties' Motions to Strike or

---

[1] Deputy Matthews is sometimes referred to as "Deputy Matthew" in the record.

[2] Deputy Robinson was previously known as "Deputy Ellis." (Doc. 83 at 16 n.22; Doc. 105 at 17). Thus, Plaintiff's claim against "Correction Officer Ellis" is duplicative of her claim against Deputy Robinson.

Exclude the Testimony of six expert witnesses, (Doc. 84; Doc. 92; Doc. 93; Doc. 94; Doc. 95; Doc. 99).

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

**A. Plaintiff's Pre-Incarceration Medical Treatment**

Prior to the incarceration at issue in this case, Plaintiff Georgia Thomas ("Thomas") injured her shoulder and ribs while moving furniture. (Doc. 98 at 5; Doc. 98-5 at 4). As a result, she sought medical treatment at the St. Elizabeth Hospital Emergency Department on December 9, 2019, where she was diagnosed with a left trapezius strain. (Doc. 98 at 5-6; Doc. 98-5 at 7). Thomas returned to the Emergency Department the following day, complaining that the prescribed medications were not alleviating her pain. (Doc. 98 at 6; Doc. 98-5 at 11). The physician opined that there were "no acute findings" in X-rays of her shoulder and ribs and consequently discharged Thomas after prescribing her additional medication. (Doc. 98 at 6; Doc. 98-5 at 14).

On December 18, 2019, Thomas again visited the St. Elizabeth Emergency Department, reporting that she fell off a step ladder and injured her back. (Doc. 98 at 6; Doc. 98-5 at 28). Again, the physician did not discover abnormalities in an X-ray of Thomas's thoracic spine and subsequently discharged her with medication and

instructions to follow up with her family doctor. (Doc. 98 at 6; Doc. 98-5 at 30–31).

On January 2, 2020, Thomas visited the St. Elizabeth Emergency Department for the third time, reporting that, three weeks prior, she slipped on ice and injured her back again. (Doc. 98 at 6; Doc. 98-5 at 43). She reported intermittent numbness and tingling in her hands and feet and claimed to have fallen forty-seven times in the past three weeks but denied trouble walking. (Doc. 98 at 6; Doc. 98-5 at 43).

On that day, Thomas tested positive for methamphetamine and marijuana and the emergency physician reviewed the records of her prior hospital visits, noting that she had given "different stories at each visit for why she fell . . . ." (Doc. 98-5 at 48). A CT scan of Thomas's head showed no abnormalities and the physician noted that she had a "normal neurologic exam," meaning that "concern for epidural abscess [is] low especially in the setting of normal heart rate and normal respiratory rate as well." (*Id.*). Accordingly, Thomas was discharged with medication. (*Id.*).

Five days later, on January 7, 2020, Thomas visited HealthPoint Family Care, where she complained of back pain and numbness in her arms and legs. (Doc. 98 at 7; Doc. 98-6 at 2). She also reported that she had not had a bowel movement "in weeks." (Doc. 98-6 at 3). Thomas's physician prescribed her a course of

medication for a cough but also documented a suspicion of drug-seeking behavior. (*Id.* at 5).

On January 9, 2020, Thomas returned to the St. Elizabeth Emergency Department. (Doc. 98 at 7; Doc. 98-5 at 61). During this visit, she complained of back pain and numbness in her arms and legs as a result of a slip on ice "several days before Christmas." (Doc. 98-5 at 63). She also reported being unable to dress herself and was walking with a cane. (*Id.*). The physician performed a CT scan of her cervical spine and an X-ray of her lumbar spine, neither of which revealed any "traumatic change." (*Id.* at 65–66). Accordingly, Thomas was discharged with pain medication and instructions to follow up for an MRI if her symptoms persisted. (*Id.* at 66).

### B. Plaintiff's Incarceration and Sick-Calls

On January 24, 2020, Thomas was arrested for a probation violation and for possessing methamphetamine and drug paraphernalia. (Doc. 83 at 3; Doc. 106-1 at 1). She was booked into the Kenton County Detention Center ("KCDC") the same day, where Southern Health Partners, Inc. ("SHP") was the contracted medical provider. (Doc. 83 at 1; Doc. 105 at 1; Doc. 106-1 at 1).

The next day, SHP Nurse James Todd Collins documented in CorrecTek, KCDC's Electronic Medical Record ("EMR") system, that he attempted to complete Thomas's intake medical screening, but

that Thomas refused to allow him to do so by saying "she was good." (Doc. 98 at 8; Doc. 98-8 at 32, 34). Nurse Collins and an unidentified witness signed a Refusal of Medical Treatment and Release of Responsibility Form for the incident. (Doc. 98-8 at 34). However, Thomas did not sign the Refusal Form and she testified that she "never refused anything in the jail." (*Id.*; Doc. 103-1, Thomas Dep. at 123:21–22).

On January 26, Thomas submitted a sick-call slip and reported that she had not had a bowel movement since December 17, 2019. (Doc. 98-8 at 40). Two days later, Nurse Collins examined Thomas, noting that her abdomen was soft and not distended. (*Id.* at 42). He ordered ten ounces of Magnesium Citrate, which Thomas immediately consumed. (*Id.*; Doc. 98 at 9). Thomas testified that, "within hours" of drinking the medication, she had a bowel movement. (Doc. 103-1, Thomas Dep. at 74:8–16).

On February 4, Nurse Collins completed Thomas's initial health evaluation and assessment, reporting that she was a "[h]ealthy appearing adult in no acute distress." (Doc. 98-8 at 49). However, Thomas submitted another sick-call slip the same day, complaining that she had numbness in both arms and legs due to a "bad fall" on December 17, 2019. (*Id.* at 60).

The following day, SHP Dr. David Suetholz signed off on Nurse Collin's assessment and SHP Nurse Caitlin Brand examined Thomas in response to her sick-call slip. (*Id.* at 50, 63). Thomas reported

5

to Nurse Brand that she had previously been to St. Elizabeth Hospital regarding her arm and leg pain and signed a Release of Information to allow SHP to obtain the medical records from her hospital visits. (*Id.* at 63). Nurse Brand reported that Thomas had normal vital signs and that she saw no obvious deformities. (*Id.*; Doc. 98 at 10). However, she did note that Thomas reported tenderness and pain with movement, with weight bearing, and without weight bearing in both of her arms and legs. (Doc. 98-8 at 63). She instructed Thomas on the importance of exercise and told her to return for further medical care if her condition did not improve but determined that there was no need to contact Dr. Suetholz at that time. (*Id.*).

On February 9, Thomas submitted another sick-call slip, again reporting numbness in her arms and legs due to a fall on December 17, 2019. (*Id.* at 72). Again, Nurse Brand examined Thomas the next day. (*Id.* at 75). Nurse Brand noted that Thomas also complained of back pain but had a normal gait when walking to the medical cart, and again informed Thomas that the physician would review her prior hospital records. (*Id.*). Thomas's St. Elizabeth Hospital records were scanned into CorrecTek the same day, but, notably, were not reviewed by Dr. Suetholz until after Thomas had been sent back to the hospital. (*Id.* at 79–92; Doc. 97, Suetholz Dep. at 12:2–22; Doc. 98 at 11).

Thomas submitted another sick-call slip on February 16, reporting that she had been constipated for two months. (Doc. 98-8 at 101). The following day, SHP Nurse Christine Troendle examined her and documented that Thomas reported that her last bowel movement had been four or five days ago. (*Id.* at 103). Nurse Troendle prescribed Docusate to be taken daily and instructed Thomas to increase her water intake. (*Id.*).

On February 20, Thomas submitted her fifth sick-call slip, complaining that the stool softeners were not working and that she had not had a bowel movement in a month. (*Id.* at 115). Thomas also requested "the drink I was giv[en] here at [the] end of January." (*Id.*). Nurse Troendle responded to Thomas's sick-call the following day, documenting that Thomas rated her pain at a zero out of ten and that she was not in acute distress. (*Id.* at 116). Nurse Troendle gave Thomas Milk of Magnesia. (*Id.*; Doc. 98 at 12).

Thomas alleges that, in addition to the sick-call slips that are part of her CorrecTek record, she submitted "substantially more requests" that were never entered into her EMR. (Doc. 105 at 2). Thomas also testified that she was "pretty much paralyzed" beginning during the first week she was incarcerated at KCDC and she reported that she had trouble walking and moving her legs to both jail and medical staff. (Doc. 103-1, Thomas Dep. at 71:10-72:8).

Other inmates also testified that, during her incarceration, Thomas had trouble walking, suffered from back and leg pain, and that she was incontinent. (*See* Doc. 106-4, McDaniel Decl. ¶¶ 19, 27, 30, 37; Doc. 106-10, Raleigh Decl. ¶¶ 7, 17, 28, 30; Doc. 106-11, Wilder Decl. ¶¶ 4, 10–11, 29, 31–32; Doc. 106-12, Williams Decl. ¶¶ 9, 11, 30; Doc. 106-31, Lunsford Decl. at 1; Doc. 106-35, Jervis Decl. ¶¶ 5, 26–29).[3] Specifically, Martie Wilder ("Wilder") testified that Thomas was unable to walk within a week of her arrest, (Doc. 106-11, Wilder Decl. ¶ 32), and Maggie McDaniel ("McDaniel") testified that Thomas could not walk to the bathroom or bend over before she was moved to Cell 107 on January 30, 2020, (Doc. 106-4, McDaniel Decl. ¶¶ 37–39; Doc. 83-10 at 1).

However, video footage of Thomas at a court appearance on February 18, 2020, shows her walking without assistance and sitting

---

[3] The Deputy Defendants argue that the testimony of one inmate is partially based on what she was allegedly told by another inmate, which constitutes inadmissible hearsay. (*See* Doc. 106-10, Raleigh Decl. ¶¶ 32–36; Doc. 109 at 3–4). Accordingly, the Court will not consider that portion of the testimony. *See Flones v. Beaumont Health Sys.*, 567 F. App'x 399, 405 (6th Cir. 2014) ("[I]t is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion."). However, contrary to the SHP Defendants' argument, the Court need not exclude all of the other inmates' declarations as "sham affidavits." (*See* Doc. 131 at 3–7). The sham affidavit doctrine prohibits someone who has already given sworn testimony from submitting an affidavit contradicting that testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). It is undisputed that none of the inmates' declarations contradict their own testimony. That they contradict other evidence in the record may create potential issues of fact, but the Court may not make a credibility determination at this stage by excluding some sources of evidence in favor of others. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

at counsel table. (Doc. 86).[4] Thomas also testified that she would smoke outside in KCDC's recreational area "quite a lot," usually once or twice per day. (Doc. 103-1, Thomas Dep. at 158:19–159:13).

### C. Plaintiff's Transfer to the Hospital

On February 23, 2020, Correctional Officer Harris called Nurse Troendle to assess Thomas because she was complaining that she was unable to use her legs. (Doc. 98 at 12; Doc. 98-8 at 129; Doc. 123, Troendle Dep. at 79:19–23). Nurse Troendle noted that Thomas's legs were stiff, but that they would bend when she was not trying to assess them. (Doc. 98-8 at 129). At that time, Thomas's vital signs were within the normal range. (*Id.;* Doc. 98 at 12). Nurse Troendle decided to move Thomas to a medical isolation cell, where she could await Dr. Suetholz's scheduled visit to the jail the following day. (Doc. 98 at 12; Doc. 123, Troendle Dep. at 80:16–19).

Thomas was transported to the medical unit by wheelchair and upon her arrival, slid out of the wheelchair and onto the floor. (Doc. 98 at 12; Doc. 123, Troendle Dep. at 80:16–18, 92:15–22). Nurse Troendle checked on Thomas three times that day, noting that she was still lying on the floor and complaining of not being able to move, but was moving her legs and bending her knees. (Doc. 98-

---

[4] The Court may properly consider the video at the summary judgment stage. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

8 at 131). Nurse Troendle also noted that Thomas had urinated on herself, but that, when asked what happened, Thomas reported that she "didn't make it to the toilet." (*Id.*; Doc. 123, Troendle Dep. at 108:18-22).

The same day, Thomas submitted an Inmate Grievance Form, referencing her December fall and reporting that "something bad [was] wrong with [her]" due to lower back pain and constipation. (Doc. 108-1 at 2). She noted that she was unable to shower or eat but also stated, "I walk on my own."[5] (*Id.*).

The next morning, on February 24, 2020, SHP Head Nurse Shawnee Thoman examined Thomas and reported that her vital signs were within the normal range. (Doc. 98 at 13-14; Doc. 98-8 at 140). Thomas told Head Nurse Thoman that "things started getting worse" the previous day and, consequently, she decided to transport Thomas to St. Elizabeth Hospital via ambulance. (Doc. 98 at 14; Doc. 98-8 at 140).

Hospital physicians performed an MRI, which revealed an abscess in the epidural space of Thomas's thoracic spine and compression of her spinal cord. (Doc. 98 at 14; Doc. 98-8 at 151-155). Thomas underwent surgery and then participated in physical

---

[5] Thomas now argues that she made a typographical error on her Grievance Form and that she actually meant to write, "I *can't* walk on my own." (Doc. 120 at 10; Doc. 120-7, Thomas Decl. ¶¶ 3-4). However, she does not dispute that, as she submitted it, the Grievance Form stated that she could walk on her own. (Doc. 120 at 10; Doc. 120-7, Thomas Decl. ¶ 3).

and occupational therapy. (Doc. 103-1, Thomas Dep. at 97:16-20, 98:6-10). However, she is now paraplegic, has no bladder or bowel control, and can only feel pain and tingling below her waist. (*Id.* at 18:19-20, 103:4-7, 104:19-21).

### D. This Lawsuit

On January 23, 2021, Thomas filed this suit. (Doc. 1). Subsequently, Thomas moved, on three separate occasions, to dismiss certain defendants from the action. (Doc. 37; Doc. 50; Doc. 62). The Court granted each motion. (Doc. 39; Doc. 54; Doc. 65). Presently remaining are Thomas's claims under 42 U.S.C. § 1983 for deliberate indifference to a serious medical need against seven deputies in their individual capacities, against five SHP medical providers in their individual capacities, and against SHP based on its policies, practices, customs, and alleged failure to provide adequate training to its employees. (*See* Doc. 1 ¶¶ 64-79).

### *Analysis*

### A. Motions for Summary Judgment

Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact,

the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson*, 477 U.S. at 255).

Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id*. However, "[t]he non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

To prevail on her claims under 42 U.S.C. § 1983, Thomas must show that (1) she was deprived of a constitutionally protected right and (2) the deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988) (internal citations omitted). Defendants do not dispute that they were acting under color of state law at all relevant times. *See Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 736 (6th Cir. 2015) (finding that private corporations act under color of state law for purposes of § 1983 when they perform traditional state functions such as providing medical care to inmates).

Accordingly, the Court will focus on the first inquiry: whether any Defendant deprived Thomas of a constitutional right.

It is well-settled that states are constitutionally obligated to provide medical care for people they incarcerate. *See Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). However, the source of the right to medical care depends upon whether an inmate is a convicted prisoner or a pretrial detainee. Convicted prisoners' claims of deliberate indifference to a serious medical need arise under the Cruel and Unusual Punishments Clause of the Eighth Amendment, while pretrial detainees' claims spring from the Due Process Clause of the Fourteenth Amendment. *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 315 (6th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 398–402 (2015)).

Until recently, courts in the Sixth Circuit used the same test to analyze deliberate indifference claims under either Amendment. *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)). However, in *Brawner*, the Sixth Circuit interpreted the Supreme Court's decision in *Kingsley* to require modification of the subjective prong of the test for pretrial detainees. *See id.* at 596.

Accordingly, to prevail on a deliberate indifference claim, both convicted prisoners and pretrial detainees must establish the same objective component: that they suffered from a sufficiently

serious medical need. *See Helphenstine*, 60 F.4th at 315, 317 (internal citations omitted).

However, as to the subjective component, convicted prisoners must establish "that a defendant 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 315 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Meanwhile, pretrial detainees face a less stringent standard and need only show that a defendant acted deliberately, not accidentally, and recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *See id.* at 317 (citing *Brawner*, 14 F.4th at 596).

Turning back to the instant case, Thomas was incarcerated for a probation violation subsequent to previous convictions and for new charges of possessing methamphetamine and drug paraphernalia. (*See* Doc. 106-1 at 1). Although it is clear that Thomas was a pretrial detainee with respect to her new charges, courts have struggled to decide whether a plaintiff's suspected probation violation makes them a pretrial detainee or a convicted prisoner. *See, e.g.*, *Green v. Taylor*, No. 1:22-CV-1007, 2023 WL 415502, at *4 n.2 (W.D. Mich. Jan. 26, 2023) (collecting cases); *Johnson v. NaphCare, Inc.*, No. 3:19-CV-054, 2022 WL 306981, at *13 (S.D. Ohio Feb. 2, 2022) (collecting cases); *Walker v. S. Health Partners*,

576 F. Supp. 3d 516, 538–39 (E.D. Ky. 2021) (applying the Fourteenth Amendment because the defendants had not argued that the more stringent Eighth Amendment approach should apply). It does not appear that the Sixth Circuit has directly addressed the issue[6] and the parties have applied both tests in their analyses.[7]

Thomas's classification is further complicated by the fact that she stipulated to violating the terms of her probation at a hearing on February 18, 2020. (*See* Doc. 86). Accordingly, to the extent Thomas was a "pretrial detainee" during the pendency of her probation violation proceedings, she likely lost that status upon admitting that violation to the court. *See Adkins v. Morgan Cnty., Tenn.*, 798 F. App'x 858, 859, 861–62 (6th Cir. 2020) (applying the Eighth Amendment deliberate indifference test after the plaintiff had been sentenced for a probation violation).[8]

---

[6] In an unpublished opinion, the Sixth Circuit applied the Fourteenth Amendment test for pretrial detainees to an inmate who was incarcerated for a probation violation but did not explain its decision to use that test. *Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *1-2 (6th Cir. Feb. 10, 2022).

[7] The SHP Defendants apply the Eighth Amendment test in their Motion for Summary Judgment, (Doc. 98 at 18-19), but apply the Fourteenth Amendment test in their Reply, (Doc. 131 at 8), while the Deputy Defendants apply the Fourteenth Amendment test and claim that Thomas was a pretrial detainee, (Doc. 83 at 1, 8-9; Doc. 109 at 1 n.1). In her Responses to both Motions for Summary Judgment, Thomas argues that the less stringent pretrial detainee test should apply because the Deputy Defendants conceded as much and her probation was not officially revoked until February 27, 2020, but she also references the Eighth Amendment test in her Response to the Deputy Defendants' Motion. (Doc. 105 at 7-10, 15; Doc. 120 at 12-13 n.1).

[8] The state court's order revoking Thomas's probation and committing her to custody was not entered until February 27, 2020, but Thomas undisputedly stipulated to the violation on February 18. (Doc. 109-1 at 1).

Other courts in this Circuit have applied both the Eighth and Fourteenth Amendment standards where it was unclear whether the plaintiff was a pretrial detainee or a convicted prisoner. *See Green*, 2023 WL 415502, at *4; *Johnson*, 2022 WL 306981, at *13. Accordingly, this Court will also apply both standards. As discussed below, the outcome for each Defendant is the same regardless of which standard is used.

### i.   *Sufficiently Serious Medical Need*

First, under either standard, Thomas must establish that she had a sufficiently serious medical need. *See Helphenstine*, 60 F.4th at 315, 317 (internal citations omitted). "A sufficiently serious medical need 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 567 (6th Cir. 2020) (quoting *Harrison v. Ash*, 559 F.3d 510, 518 (6th Cir. 2008)). The Deputy Defendants concede that Thomas had an objectively serious medical need beginning on February 23, 2020, when she experienced immobility, (Doc. 83 at 12– 13),[9] but the SHP Defendants argue that Thomas did not have an objectively serious medical need at all during her incarceration, (Doc. 98 at 20–22).

---

[9] The Deputy Defendants also note that the testimony of other inmates establishes that Thomas had an objectively serious medical need "*at some point* in a dorm." (Doc. 83 at 13 n.17).

The Sixth Circuit has found that a plaintiff's spinal abscess, like the one Thomas undisputedly suffered from, was an objectively serious medical need. *See Adkins*, 798 F. App'x at 860, 862. Similarly, other courts have concluded that a spinal abscess satisfies the objective component of a deliberate indifference claim. *See, e.g.*, *Smith v. Campbell Cnty., Ky.*, No. 16-13-DLB-CJS, 2019 WL 1338895, at *9 (E.D. Ky. Mar. 25, 2019) (finding a serious medical need where the plaintiff had an epidural abscess and osteomyelitis of the spine resulting in sepsis and paraplegia); *Ham v. Marshall Cnty., Ky.*, No. 5:11-CV-11, 2012 WL 6675133, at *6 (W.D. Ky. Dec. 21, 2012) (finding a serious medical need where the plaintiff suffered from an undiagnosed spinal abscess that ultimately rendered him paraplegic).

While there is some conflicting evidence in the record as to what Thomas's symptoms were or when they began, none of the Defendants dispute that Thomas was ultimately diagnosed with a spinal abscess or that she had that spinal abscess during her incarceration. Therefore, Defendants' arguments that other medical conditions, such as back pain caused by a previous injury, constipation, tingling and numbness caused by diabetes, and a pinched nerve, are not sufficiently serious are misplaced because Defendants do not and cannot argue that Thomas's ultimate injuries were caused by those conditions, even if she had them. (*See* Doc. 83 at 12-13; Doc. 98 at 20-22).

17

It is also immaterial that spinal abscesses can be difficult to diagnose and that Thomas's immobility may not have begun until later in her period of incarceration. The Sixth Circuit has held that the test for serious medical need is whether, upon being notified that someone has a condition, a lay person would deem it serious, not whether the condition is "obviously detectable to the eye." *Lumbard v. Lillywhite*, 815 F. App'x 826, 832 (6th Cir. 2020) (citing *Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014)) (finding that multiple sclerosis was a serious medical need even where the plaintiff did not know he was suffering from it). Thus, even though Thomas's spinal abscess was invisible to the eye, because it can, and did in this case, cause permanent damage and disability, a lay person would undoubtedly deem it serious.

Accordingly, Thomas has satisfied the objective component of her deliberate indifference claim. The Court must turn to whether Thomas has satisfied the subjective component for each of the Defendants.

### ii. *The Deputy Defendants*

#### a. *Deputy Bone*

The parties agree that Deputy Bone was only on shift in the dorm units where Thomas was housed on February 6, 11, 12, 18, and 22, 2020. (Doc. 83 at 12; Doc. 105 at 12). It is thus undisputed that each of Thomas's interactions with Deputy Bone occurred after

18

Nurse Collins determined that Thomas did not need further medical attention on January 28 and February 4 and Nurse Brand made a similar finding on February 5. (*See* Doc. 98-8 at 42, 49, 63). Further, each of Deputy Bone's shifts with Thomas were close in time to Thomas's other sick-call visits with SHP medical staff on February 10, 17, and 21. (*See id.* at 75, 103, 116). Indeed, Deputy Bone noted that she observed Thomas "going to med pass and sick call" and "receiving something from the nurses while [she] was on post." (Doc. 83-13, Bone Interrogatories ¶ 9).

Accordingly, even assuming, as Thomas has argued, that Deputy Bone failed to respond to Thomas and her fellow inmates' requests for help, Deputy Bone cannot be liable for deliberate indifference. Kentucky law requires that jails, such as KCDC, contract with a licensed healthcare provider to provide medical care to inmates. *See* 501 K.A.R. 3:090 § 1(1). That regulation also provides that "health care staff shall not be restricted by the jailer in the performance of their duties except to adhere to the jail's security requirements." *Id.* § 1(3).

Further, the Sixth Circuit has "recognized that a 'non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" *Greene v. Crawford Cnty.*, 22 F.4th 593, 608 (6th Cir. 2022) (quoting *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017)).

Accordingly, where jail staff have no reason to know or believe that a medical professional's recommendation is inappropriate, they do not act with deliberate indifference by following it. *McGaw*, 715 F. App'x at 498; *see also Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (finding that a non-medically trained officer did not act with deliberate indifference when he relied on the opinions of EMTs and a jail nurse, who concluded that the plaintiff did not need to be transported to the hospital).

Here, Deputy Bone, a non-medical member of jail staff, was aware that Thomas was under the care of the SHP staff and she deferred to their medical opinions as to the seriousness of Thomas's condition and whether her symptoms necessitated further treatment. Although there is evidence that Thomas and other inmates persistently complained to Deputy Bone about Thomas's condition,[10] Thomas has not established or even alleged that anyone reported changes in her symptoms to Deputy Bone between sick-call visits such that she should have been aware of a risk that the medical staff had not already evaluated. (*See* Doc. 105 at 12-13).

Thomas argues that, because Dr. Suetholz testified that he was not made aware of Thomas's medical condition, there was no

---

[10] Thomas testified that she did not recall any interactions with Deputy Bone, (Doc. 103-1, Thomas Dep. at 133:13-134:7), but other inmates did recall witnessing interactions between the two and testified to asking Deputy Bone for help on behalf of Thomas, (*see* Doc. 106-10, Raleigh Decl. ¶¶ 12, 15; Doc. 106-11, Wilder Decl. ¶ 16; Doc. 106-12, Williams Decl. ¶¶ 13-14; Doc. 106-35, Jervis Decl. ¶ 9).

medical judgment upon which any deputy could rely. (*Id.* at 11).
However, this ignores the medical judgments that Licensed
Practical Nurses ("LPNs") Collins, Brand, and Troendle issued
based on their assessments of Thomas. (*See* Doc. 83 at 3–4). Indeed,
the Sixth Circuit has explicitly held that it has never "recognized
the status of an LPN as precluding an officer from relying on that
LPN's judgment." *McGaw*, 715 F. App'x at 498.

Further, Thomas has not established that Deputy Bone had
reason to believe that the SHP staff's course of action was
inappropriate. Three of the cases Thomas cites for the proposition
that Deputy Bone could not rely on the nurses' evaluations, (*see*
Doc. 105 at 13), are inapposite. *See Harrison*, 539 F.3d at 519
(finding that prison officials were not deliberately indifferent
because they reasonably responded to a substantial risk to an
inmate's health); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 896
(6th Cir. 2004) (finding the subjective prong satisfied where only
non-medical prison officials treated the plaintiff for over fifty
hours); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d
834, 845 (6th Cir. 2002) (evaluating whether medical professionals
were themselves deliberately indifferent under the "grossly
inadequate care" standard).

The fourth case on which Thomas relies, *Ham v. Marshall
County*, 2012 WL 6675133, at *7, also fails to support her argument.
In that case, a court in the Western District of Kentucky relied

on *Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987), a case that was neither binding on that court nor on this Court, for the proposition that prison officials may be deliberately indifferent where an inmate receives medical treatment but continues to complain of symptoms that would make it obvious that he or she requires further and immediate medical attention. (*See* Doc. 105 at 11). But this Court is bound by Sixth Circuit case law, which holds that lay officers may rely on the medical assessments of trained medical personnel. *See Greene*, 22 F.4th at 608; *Spears*, 589 F.3d at 255.

Here, Thomas was evaluated by several medical professionals and none of them concluded that she needed further medical attention until February 24, 2020. Further, unlike in *Ham*, where the plaintiff was not re-evaluated by medical personnel, Thomas does not dispute that she was seen by the SHP nurses repeatedly, up until the moment she was sent to the hospital by a SHP nurse. *See* 2012 WL 6675133, at *7-8. Thomas has not introduced evidence from which a reasonable jury could conclude that Deputy Bone's reliance on the assessments of those medical professionals was unreasonable. Thus, she cannot be held liable for deliberate indifference based on that reliance.

While Thomas claims that Deputy Bone never called or offered to call medical staff, (Doc. 105 at 13), that is also immaterial,

as it is undisputed that Thomas was seen by medical staff before and after each of her interactions with Deputy Bone.

Accordingly, Thomas cannot establish that Deputy Bone acted recklessly in the face of an unjustifiably high risk of harm that was or should have been known to her. Because Thomas has not shown that Deputy Bone's actions satisfy the more lenient Fourteenth Amendment test, they cannot meet the Eighth Amendment test either.

### b. Deputy Bradford

The parties agree that Deputy Bradford was on post in Thomas's dorm unit on January 25, 26, 27, and 31, 2020, and on February 2 and 13, 2020. (Doc. 83 at 23–24; Doc. 105 at 13–14). They dispute whether Deputy Bradford was also on post with Thomas on January 30 and on February 7 and 20, but for the purposes of Defendants' Motion for Summary Judgment, these disputes are not material. (*See* Doc. 83 at 23–24; Doc. 105 at 13–14).[11]

Unlike Deputy Bone, Deputy Bradford worked in Thomas's unit before she was first assessed by Nurse Collins on January 28. However, Thomas has not established that there were facts from which Deputy Bradford could have perceived that Thomas had a

---

[11] The Deputy Defendants claim that Deputy Bradford was on post in Thomas's unit on January 30 and February 20, but neither of these dates are cited by Thomas in her Response. (*See* Doc. 83 at 23–24; Doc. 105 at 13–14). Similarly, Thomas reports that Deputy Bradford was on post in her unit on February 7, but the Deputy Defendants do not cite that date. (*See* Doc. 83 at 23–24; Doc. 105 at 13–14).

serious medical need prior to her initial contact with medical staff.

Thomas testified that she told Deputy Bradford about her condition and that she needed help, but Deputy Bradford "pretty much laughed in [her] face and rolled her eyes and walked away" at some point during the first or second week of February. (Doc. 103-1, Thomas Dep. at 140:21–141:11). However, Thomas clarified that she had been seen by medical staff prior to that conversation with Deputy Bradford. (*Id.* at 141:18–25).

Additionally, other inmates, who were housed with Thomas on January 31 and February 2, testified that Thomas complained to Deputy Bradford, but that she did not help Thomas. (Doc. 105 at 14; Doc. 106-11, Wilder Decl. ¶ 17; Doc. 106-35, Jervis Decl. ¶¶ 10–11). None of this testimony establishes that Deputy Bradford should have been aware of Thomas's condition between January 25–27 or that Thomas's condition changed in between medical evaluations such that Deputy Bradford should have been aware of an unevaluated risk.

As to McDaniel, who was housed with Thomas during the relevant period, she testified that she was "not sure if Georgia or [other] inmates interacted with [Deputy Bradford] about Georgia . . . ." (Doc. 105 at 14–15; Doc. 106-4, McDaniel Decl. ¶ 13). Although McDaniel testified that Deputy Bradford "would have been aware that Georgia was crying out in pain and unable to walk or help

24

herself" this amounts to speculation, as McDaniel admitted that she did not know whether Deputy Bradford ever interacted with Thomas.

This is particularly true when McDaniel's testimony is considered with Thomas's own testimony, which establishes that she did not interact with Deputy Bradford regarding her condition until February. It is well-settled that such speculation cannot create a genuine issue of material fact at the summary judgment stage. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations.").

Accordingly, Thomas has failed to establish that Deputy Bradford was aware of Thomas's condition before she was evaluated by medical staff, and thus, like Deputy Bone, Deputy Bradford was entitled to rely on the opinions of the SHP nurses. There is no evidence from which a reasonable jury could find that Deputy Bradford acted recklessly in the face of a risk of harm that she was or should have been aware of and, thus, she cannot be held liable under either the Fourteenth or Eighth Amendment test. She, too, is entitled to summary judgment on Thomas's claim against her.

*c. Deputy Matthews*

Deputy Matthews worked in Thomas's dorm unit on January 27 and on February 3, 16, 22, and 23, 2020. (Doc. 105 at 15). Thomas does not argue that Deputy Matthews perceived facts indicating a substantial risk of harm to Thomas's health or safety during her January 27 and February 3 shifts.

Thomas testified that she asked Deputy Matthews for medical help "a little over a week" before she was moved to medical isolation. (Doc. 103-1, Thomas Dep. at 119:16–120:1). Based on the undisputed timeline, this interaction likely took place on Deputy Matthews's February 16 shift. Thomas reported that Deputy Matthews told her she would bring the issue to her sergeant's attention and, after her break, she returned to let Thomas know that she had spoken to the sergeant, who was trying to contact medical staff. (*Id.* at 120:1–7). Although Thomas testified that medical staff never came to evaluate her, she stated that she did believe that Deputy Matthews had talked with her sergeant. (*Id.* at 120:6–7, 120:21–23).

Thomas now argues that, because no member of medical staff came to her cell, a jury "can infer that Defendant Matthews never made the request . . . ." (Doc. 105 at 16). However, this amounts to mere speculation, which is insufficient to support Thomas's claim at the summary judgment stage. *See Arendale*, 519 F.3d at

605. This is particularly true given that Thomas herself has already testified that she believed that Deputy Matthews did report her concerns to the sergeant.

Although medical staff may not have immediately seen Thomas in response to Deputy Matthews's request, that is immaterial, because Thomas has not specified what else Deputy Matthews could or should have done. *See Albin v. Suetholz*, No. 21-6044, 2022 WL 3572977, at *4 (6th Cir. Aug. 19, 2022) (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (finding that a deputy had not acted with deliberate indifference where he alerted his supervisor and medical staff of an inmate's medical condition); *see also Greene*, 22 F.4th at 608 (citing *Farmer*, 511 U.S. at 844) (opining that prison officials are not liable for deliberate indifference when they respond reasonably to a risk, even if their response does not ultimately prevent harm to an inmate). Further, Thomas does not dispute that she was seen by medical staff on February 17.[12]

Deputy Matthews also testified that, during her twelve-hour shift on February 22–23, Thomas reported that she was in pain and having trouble walking. (Doc. 83-16, Matthews Interrogatories ¶ 3). In response, Deputy Matthews called medical staff to report

---

[12] Because Deputy Matthews worked from 11:00 p.m. on February 16 to 7:00 a.m. on February 17, (Doc. 105 at 15; Doc. 106-19 at 1), Nurse Troendle's February 17 sick-call visit was actually later during the same day. (*See* Doc. 98-8 at 103).

Thomas's condition, and, on February 23, Nurse Troendle transferred her to the medical isolation unit. (*Id.*). After Thomas's transfer, Deputy Matthews again called Nurse Troendle to report Thomas's continued immobility and incontinence. (*Id.*).

Because Deputy Matthews responded reasonably to the risks she perceived to Thomas's health and safety by alerting her supervisor and medical staff, she did not act with deliberate indifference. The Court finds that Deputy Matthews is entitled to summary judgment on Thomas's claim against her under either the Fourteenth or Eighth Amendment standard.

### d. Deputy Molen

Deputy Molen worked in Thomas's housing unit on January 28 and on February 1, 8, 10, 14, and 21, 2020. (Doc. 105 at 16).[13] Thomas testified that, during the second or third week in February, she asked Deputy Molen for help. (Doc. 103-1, Thomas Dep. at 138:3–11, 140:9–10). According to Thomas, Deputy Molen responded that she would call medical staff, but she never picked up the phone to do so. (*Id.* at 138:19–22). However, Thomas also testified that she

_____

[13] Deputy Molen testified that she also worked in Thomas's unit on February 24, 2020, and called medical staff in response to Thomas's request, which resulted in Thomas being transported to the hospital that morning. (Doc. 83-21, Molen Interrogatories ¶ 4). She then spent sixteen hours on post at the hospital with Thomas. (*Id.*). The Deputy Defendants also report that Deputy Molen was on post with Thomas on February 7. (Doc. 83 at 23 n.26). However, Thomas does not argue that Deputy Molen displayed deliberate indifference during those interactions.

"can't be certain" whether Deputy Molen called medical staff outside of the dorm where she was confined. (*Id.* at 139:15–21). Thomas also noted that she had been examined by medical staff both before and after that interaction. (*Id.* at 140:11–17).

Another inmate, Patricia Raleigh ("Raleigh"), who was housed with Thomas during Deputy Molen's February 1 shift in Cell 107, testified that Deputy Molen did not help Thomas, despite Thomas's pleas for help. (Doc. 105 at 16; Doc. 106-10, Raleigh Decl. ¶ 12).

For her part, Deputy Molen testified that she contacted medical staff about Thomas's complaints of constipation while she was in booking and that she also called at least three times in the dorm to report Thomas's concerns and, to the best of her recollection, Thomas was seen by medical staff either the same day or the next day in response to each call. (Doc. 83-21, Molen Interrogatories ¶ 4). She also noted that, when other inmates asked why Thomas was not being sent to the hospital, she told them that the medical staff were aware of Thomas's condition and that treatment decisions were at their discretion. (*Id.* ¶ 6).

Just as with the other Deputy Defendants, Thomas has failed to show that Deputy Molen acted recklessly in the face of a substantial risk to her health or safety. Each of Deputy Molen's shifts occurred on the same day as or after Thomas's initial assessment by Nurse Collins on January 28. Because Thomas has not established that it was unreasonable for Deputy Molen to rely on

the judgment of Nurse Collins during that visit or the judgment of Nurses Brand and Troendle during their later visits, she has not established that Deputy Molen acted with deliberate indifference. Although Raleigh testified that Deputy Molen ignored Thomas's request for help on February 1, she did not testify, and Thomas has not otherwise established, that her condition changed between her examination on January 28 and her complaints on February 1 such that Deputy Molen should have been aware of a new risk of harm that had not been evaluated by medical professionals.

Further, Thomas's speculation that Deputy Molen did not call medical staff in response to her request, despite her own admission that she "can't be certain" whether she did, is not sufficient to create a genuine issue of material fact. (*See* Doc. 103-1, Thomas Dep. at 139:15–21). This is especially true because Thomas acknowledges that she was seen by SHP nurses after that interaction. (*Id.* at 140:14–17).

Thomas argues that the Sixth Circuit has held that the delay of medical treatment can impose liability on officers, (Doc. 105 at 17), but that is only true "'where it is apparent that delay would detrimentally exacerbate the medical problem . . . .'" *See Blackmore*, 390 F.3d at 897 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187–88 (11th Cir. 1994)). Thomas has not established that it was or should have been apparent to a non-

medically trained officer, like Deputy Molen, that delayed medical treatment would detrimentally exacerbate her condition.

Accordingly, Deputy Molen is also entitled to summary judgment under either standard.

### e. Deputy Robinson

Deputy Robinson was on shift in Thomas's unit on January 25 and on February 5, 9, 12, 15, 16, 18, and 23, 2020. (Doc. 83 at 18 n.25; Doc. 105 at 17). Thomas testified that she asked Deputy Robinson for help changing her clothes on February 23, while she was in medical isolation, but that Deputy Robinson declined to help her because she claimed that she had her own back injury and she did not want to get sick. (Doc. 103-1, Thomas Dep. at 113:1–16).

She also testified to separate interactions in Cell 107 with Deputy Ellis, who the parties agree is the same person as Deputy Robinson,[14] during which she asked her to contact medical staff. (*Id.* at 117:3–11). Thomas admitted that she had "no idea" whether Deputy Ellis contacted medical staff in response to her request and she acknowledged that she had been seen by nurses during sick-calls after making that request. (*Id.* at 117:12–17). Notably, the

---

[14] During her deposition, Thomas gave different physical descriptions for Deputies Robinson and Ellis, (Doc. 103-1, Thomas Dep. at 116:17–117:2), but the parties nonetheless agree that those names refer to the same person. (*See* Doc. 83 at 16 n.22; Doc. 105 at 17).

only time Deputy Robinson worked in Cell 107 while Thomas was held there was on February 5. (Doc. 105 at 17).

Another inmate, Amy Lunsford ("Lunsford"), testified that Deputy Robinson failed to help Thomas three to four days before she was transferred to medical isolation on February 23. (*Id.;* Doc. 106-31, Lunsford Decl. at 3). Lunsford claims that Deputy Robinson did not call the nurses because "they never showed up." (Doc. 106-31, Lunsford Decl. at 4). She also recalled that Deputy Robinson did not provide Thomas assistance despite witnessing the other inmates dragging her to the bathroom on a blanket about two to three days before her transfer. (*Id.*).

Wilder, who was housed with Thomas in Cell 107 and 108, also testified that Deputy Robinson saw the inmates pulling Thomas around on a sheet and heard the inmates' requests for help, but that she did not see her call nursing staff in response. (Doc. 106-11, Wilder Decl. ¶¶ 3, 11, 20). However, Wilder noted that Deputy Robinson did tell her that "they were all aware of Georgia's problems . . . ." (*Id.* ¶ 20).

Another inmate, Katerra Jervis ("Jervis"), testified that Deputy Robinson did call for medical help and became "angry when no one would help Georgia." (Doc. 106-35, Jervis Decl. ¶ 19).

For her part, Deputy Robinson testified that she called her supervisor and medical staff twice on February 23, after realizing that Thomas was incontinent and could not move her legs. (Doc. 83-

32

18, Robinson Interrogatories ¶¶ 4, 6). These calls resulted in Thomas being transferred to medical isolation and nursing staff evaluating Thomas during med-pass. (*Id.*).

Although one of Deputy Robinson's shifts with Thomas was before her initial contact with medical staff on January 28, Thomas has not argued that Deputy Robinson should have perceived a serious risk of harm to her on that date. Accordingly, Deputy Robinson was entitled to rely on the medical opinions of the SHP nurses, just as the other Deputies were.

Thomas has introduced evidence that Deputy Robinson was aware of her medical condition both because Thomas and other inmates complained to her and because she saw other inmates using sheets and blankets to help Thomas get to the bathroom. However, the only evidence that Thomas has presented as to Deputy Robinson's alleged failure to respond to what she saw and heard is speculation. Although Lunsford and Wilder, who were confined to their units, never saw Deputy Robinson call medical staff and the SHP nurses did not immediately respond to evaluate Thomas, this is insufficient evidence from which to conclude that Deputy Robinson did not actually contact anyone about Thomas's condition. This is particularly true when the Court considers that another inmate, Jervis, reported that she did witness Deputy Robinson calling for medical help.

Further, Thomas agrees that she was seen and evaluated by the SHP nurses on February 5, 10, 17, and 21, before she was transferred to medical isolation on February 23. (*See* Doc. 98-8 at 63, 75, 103, 116). Accordingly, even if Deputy Robinson did fail to contact medical staff, Thomas was nonetheless seen and evaluated after her complaints.

Additionally, Lunsford's testimony that Deputy Robinson saw the inmates dragging Thomas on a sheet two to three days before her transfer, which would have been February 20 or 21, 2020, does not correspond to the shifts Thomas has identified Deputy Robinson as working on February 18 and 23. However, even if Lunsford was referring to one of those shifts instead, Thomas was undisputedly seen by medical staff on February 17, 21, and 23. Further, Thomas had a court appearance on February 18 during which she was recorded walking without assistance. (*See* Doc. 86). Accordingly, to the extent that Thomas is attempting to establish that she could not walk at all during Deputy Robinson's February 18 shift, the Court must "view[] the facts in the light depicted by the videotape." *See Scott*, 550 U.S. at 381.

Deputy Robinson's alleged refusal to help change Thomas's clothes on February 23 also does not amount to deliberate indifference to a serious medical need. Nurse Troendle was undisputedly aware of Thomas's mobility and incontinence issues at that time. (*See* Doc. 98-8 at 131). Because Nurse Troendle concluded

that, even in light of those symptoms, Thomas did not need additional medical care or assistance, Deputy Robinson cannot be held liable for relying on Nurse Troendle's judgment. *See Spears*, 589 F.3d at 255.

Thomas has not established that Deputy Robinson acted recklessly in the face of a substantial risk of harm that she was or should have been aware of. Under either standard, Deputy Robinson is entitled to summary judgment on Thomas's claim against her.

### f. Deputy Knight

Deputy Knight worked in the units where Thomas was housed on January 25 and 26 and on February 19, 2020. (Doc. 83 at 20; Doc. 105 at 18).

Thomas does not argue that Deputy Knight should have been aware of a substantial risk of harm to her on January 25 or 26. Rather, Thomas testified that her only interaction with Deputy Knight occurred in mid-February, which corresponds to Deputy Knight's February 19 shift. (*See* Doc. 103-1, Thomas Dep. at 137:11–21). Thomas stated that she asked to be seen by medical staff during the overnight shift and that, in response, Deputy Knight went over the procedure for submitting a sick-call slip with her. (*Id.* at 137:22–138:2). Indeed, Thomas did submit a sick-call slip

on February 20 and was seen by Nurse Troendle regarding that request the following day. (Doc. 98-8 at 115-16).

The only other evidence Thomas cites in support of her claim against Deputy Knight is the testimony of fellow inmate Jervis. (Doc. 105 at 18). Jervis testified that Deputy Knight "blew [] off" Thomas's requests for help. (Doc. 106-35, Jervis Decl. ¶ 21). However, Thomas admits that Jervis was only housed with her in Cell 107, which Deputy Knight never worked in. (*See* Doc. 105 at 18).

Jervis's vague statement, which Thomas acknowledges is not supported by the undisputed facts and is not tied to any specific date or time, is insufficient, standing alone, to establish the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (internal citations omitted) (finding that the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts" and should instead "present significant probative evidence" to defeat a motion for summary judgment).

Because Deputy Knight responded reasonably to Thomas's requests for medical assistance by explaining the sick-call

procedure, which Thomas then successfully used to obtain a medical evaluation, a reasonable jury could not conclude that Deputy Knight acted with deliberate indifference to Thomas's serious medical need under either the Fourteenth or Eighth Amendment standard.

### g. Deputy Earl

Thomas acknowledges that Deputy Earl was not listed as a deputy on post for any of her units until after she had been transferred to medical isolation on February 23, 2020. (Doc. 105 at 19). However, Thomas testified that, at the beginning of February, she sent one of her fellow inmates to ask Deputy Earl for medical assistance. (Doc. 103-1, Thomas Dep. at 134:8-16, 136:15-16). Thomas reported that Deputy Earl promised to "do what she could," but that she has "no clue" whether Deputy Earl actually contacted medical staff. (*Id.* at 134:15-20).

McDaniel testified that, in Cell 107, where Thomas was housed between January 30 and February 6, she told Deputy Earl about Thomas's pain, incontinence, and mobility issues. (Doc. 105 at 19; Doc. 106-4, McDaniel Decl. ¶ 18). However, McDaniel noted that Deputy Earl merely "brushed it off" and refused to speak to Thomas. (Doc. 106-4, McDaniel Decl. ¶ 19). McDaniel also testified that she filled out a sick-call slip for Thomas and gave it to Deputy Earl, but that sick-call slip was never scanned into Thomas's CorrecTek medical record. (*Id.* ¶ 21; Doc. 105 at 20).

Raleigh testified that Deputy Earl refused to help Thomas, despite her complaints that she could not feel her legs. (Doc. 106-10, Raleigh Decl. ¶¶ 12, 23–24). Raleigh, too, was housed with Thomas in Cell 107. (*Id.* ¶¶ 5, 37–38; Doc. 105 at 20).

Deputy Earl reported that her only interaction with Thomas was getting her some water in the medical isolation unit on February 23. (Doc. 83 at 19; Doc. 83-20, Earl Interrogatories ¶¶ 8–9).

Just as for the other Deputy Defendants, Thomas has failed to establish that Deputy Earl acted with deliberate indifference. Although Thomas has introduced evidence that, at some point, Deputy Earl was working in Cell 107, Thomas was seen and evaluated by Nurse Collins on January 28, before being transferred to Cell 107, and again by him on February 4 and by Nurse Brand on February 5, while she was in Cell 107. (*See* Doc. 98-8 at 42, 49, 63). Therefore, Deputy Earl was entitled to reasonably rely on Nurses Collins and Brand's medical judgment that no further treatment was necessary for Thomas's condition.

Even assuming that Deputy Earl did fail to turn in the sick-call slip McDaniel handed her, Thomas does not dispute that she was seen by medical staff both before and after that incident. Accordingly, Deputy Earl's actions did not preclude Thomas from receiving medical attention and, thus, Deputy Earl did not cause Thomas's injuries. *See Horn ex rel. Parks v. Madison Cnty. Fiscal*

*Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) (citing *Doe v. Sullivan Cnty., Tenn.*, 956 F.2d 545, 550 (6th Cir. 1992) (finding that "proximate causation is an essential element of a § 1983 claim for damages").

Although the parties agree that Deputy Earl was on post in the medical isolation unit while Thomas was housed there, Thomas does not argue that Deputy Earl acted with deliberate indifference at that time. Therefore, Thomas has not established that Deputy Earl knew or should have known of a serious risk of harm to Thomas's health or safety or, even if she did, that her actions caused Thomas harm. Thus, Deputy Earl is also entitled to summary judgment regardless of whether the Court applies the Fourteenth or Eighth Amendment test.

### h. *Qualified Immunity*

Finally, the Deputy Defendants argue that they are entitled to qualified immunity. (Doc. 83 at 25). The qualified immunity analysis has "two steps that can be undertaken in any order: (1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events." *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020) (citing *Godawa v. Byrd*, 798 F.3d 457, 462-63 (6th Cir. 2015)).

Because the Court finds that no Deputy Defendant violated Thomas's constitutional rights, it need not proceed to the second step of the qualified immunity analysis. However, even if the Court did find evidence of a constitutional violation, the Deputy Defendants would nonetheless be entitled to qualified immunity because Thomas has not identified the violation of a clearly established right.

A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 476 (6th Cir. 2021) (internal citation and quotation marks omitted). "To create such a clearly established rule, a case need not be 'on all fours' with the plaintiff's case." *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019)). However, the facts of a "prior case must be 'similar enough to have given fair and clear warning to officers about what the law requires.'" *Id.* (quoting *Vanderhoef*, 938 F.3d at 279).

Although the Sixth Circuit has held that an incarcerated person's right to treatment for a serious medical need is and has been established for some time, *see Greene*, 22 F.4th at 615, courts may not define clearly established law at a high level of generality. *See Beck*, 969 F.3d at 599 (citing *City and County of*

40

*San Francisco v. Sheehan*, 575 U.S. 600 (2015)). Accordingly, Thomas must cite a case that clearly required the Deputy Defendants to do more than they did. *See Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993-94 (6th Cir. 2017) (finding that officers were entitled to qualified immunity on a deliberate indifference claim because the plaintiff had not pointed to a case requiring them to do more than they did).

As discussed above, the Sixth Circuit's opinions in *Terrance* and *Blackmore* do not clearly require the Deputy Defendants to do more than they did here because the factual circumstances of those cases were distinct from those of Thomas's case. In *Terrance*, the Sixth Circuit was assessing the conduct of medical professionals, not non-medically trained officers like the Deputy Defendants. *See* 286 F.3d at 844-47. Further, in *Blackmore*, non-medical prison officials treated the plaintiff's abdominal pain with antacids and did not contact medical staff for over fifty hours. 390 F.3d at 896. But here, it is undisputed that none of the Deputy Defendants attempted to treat Thomas's condition themselves and, as discussed above, the Deputy Defendants relied on the medical opinions of Nurses Collins, Brand, and Troendle, each of whom undisputedly examined Thomas multiple times during her incarceration.

Thomas also cites *Taylor v. Franklin County, Kentucky*, 104 F. App'x 531 (6th Cir. 2004), in support of her argument that the Deputies violated her clearly established right. (Doc. 105 at 23).

In that case, the Sixth Circuit held that a jury could find that a prison official acted with deliberate indifference to the plaintiff's complaints of back pain, loss of mobility, and incontinence even after he took the plaintiff to the jail nurses' station. *Taylor*, 104 F. App'x at 539–40. However, *Taylor* is also factually distinct from Thomas's case. There, the nurse did not provide medical care to or examine the plaintiff, but instead merely "observed" him before she helped drag him back to his cell on a mattress. *See id.* at 535, 540. Ultimately, the plaintiff in *Taylor* was released from the jail and, because he could not walk, officers carried him outside and lowered him onto the sidewalk, leaving his personal items beneath his head. *Id.* at 536.

Here, Thomas does not dispute that she was examined by three different nurses on six different occasions during her incarceration, even if she does dispute whether her medical records accurately reflect the information exchanged during those examinations. (*See* Doc. 105 at 4–5). Further, Thomas agrees that she was placed under medical observation before being transferred to the hospital the day after "things started getting worse." (*See* Doc. 98-8 at 140). Accordingly, unlike in *Taylor*, where the plaintiff never received any medical care in jail, Thomas did receive medical attention. *See* 104 F. App'x at 540. As discussed above, the Deputy Defendants were entitled to rely on the SHP nurses' conclusions that Thomas did not need to be transported to

the hospital, even if those nurses ultimately failed to accurately diagnose her. *See McGaw*, 715 F. App'x at 498-99; *Spears*, 589 F.3d at 255.[15]

Because Thomas has failed to point to clearly established law requiring the Deputy Defendants to do more than they did, each of them is entitled to qualified immunity.

### iii. The SHP Defendants

"In cases involving mistreatment by medical personnel, [the Sixth Circuit] has held that 'less flagrant conduct [than that of other government officials] may constitute deliberate indifference.'" *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008) (quoting *Terrance*, 286 F.3d at 843). In deciding whether a plaintiff's deliberate indifference claim against a medical professional may survive summary judgment, a court must ask whether a reasonable jury could find that a reasonable doctor or nurse in the defendant's position could have concluded that a substantial risk of serious harm to the plaintiff existed. *Terrance*, 286 F.3d at 844, 846.

Further, if medical professionals become aware of a substantial risk of serious harm to an inmate, they must not disregard that risk. Accordingly, medical professionals must not

---

[15] Thomas may also not rely on *Taylor*, an unpublished decision, for evidence that her right was clearly established. *See Bell v. City of Southfield, Mich.*, 37 F.4th 362, 367-68 (6th Cir. 2022).

43

"consciously act[] unreasonably in response to [a] known risk." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 485 (6th Cir. 2014). Additionally, "[g]rossly inadequate medical care may establish deliberate indifference." *Shadrick*, 805 F.3d at 744 (citing *Terrance*, 286 F.3d at 843).

### a. Nurse Collins

Nurse Collins had three relevant interactions with Thomas. First, on January 25, 2020, he reported that Thomas refused her intake medical screening by saying "she was good." (Doc. 98-8 at 32, 34). However, Thomas testified that she "never refused anything in the jail." (Doc. 103-1, Thomas Dep. at 123:21-22).

Next, on January 27, he scanned in a sick-call slip Thomas had submitted the day before, in which she claimed that she had not had a bowel movement since December 17. (Doc. 98-8 at 39-40). The following day, Nurse Collins examined Thomas, reporting that her abdomen was "soft and not distended." (*Id.* at 42). He then administered ten ounces of Magnesium Citrate, which allowed her to have a bowel movement "within hours." (*Id.*; Doc. 103-1, Thomas Dep. at 74:12-15).

Then, Nurse Collins completed Thomas's initial health evaluation and assessment on February 4, noting that she refused to allow him to take her vital signs, but she was a "[h]ealthy appearing adult in no acute distress." (Doc. 98-8 at 49-50). A

44

little over an hour after completing his charting on that assessment, he scanned in another sick-call slip that Thomas submitted the same day, this time for numbness in her arms and legs due to her pre-incarceration fall. (*Id.* at 49–50, 58–60). Nurse Brand, not Nurse Collins, responded to Thomas's sick-call slip the next day. (*Id.* at 63–64).

Although the parties dispute whether Thomas did refuse Nurse Collins's initial attempts to complete her intake screening and to take her vital signs, even drawing factual inferences in Thomas's favor as the Court must do at this stage, Nurse Collins's failure to complete her initial intake screening on January 25 and to take her vital signs on February 4 does not establish that he acted with deliberate indifference in the face of an unjustifiably high risk of harm that was or should have been known to him.

While the Sixth Circuit has held that a nurse's failure to complete an inmate's intake medical screening and take his or her vital signs can be evidence of deliberate indifference, that is only true in circumstances where the nurse would have discovered an inmate's illness upon completing those assessments. *See Cook v. Martin*, 148 F. App'x 327, 338 (6th Cir. 2005). But, here, when Thomas's initial assessment was completed by Nurse Collins on February 4 and when her vital signs were taken by Nurse Brand on February 5, neither revealed any apparent medical concerns. (*See*

Doc. 98-8 at 49-50, 63). Accordingly, Thomas was not harmed by Nurse Collins's alleged failures. *See Horn*, 22 F.3d at 659.

Further, Thomas has not alleged or pointed to any evidence that she complained of any symptom, other than constipation, to Nurse Collins. Nor does she dispute that Nurse Collins successfully treated her constipation with medication two days after she reported it. The mere fact that Thomas complained of constipation would not have been enough to alert any medical professional of her underlying spinal abscess. *See Jones v. Muskegon Cnty.*, 625 F.3d 935, 942, 945-46 (6th Cir. 2010) (finding that a physician did not act with deliberate indifference where he initially diagnosed colorectal cancer as severe constipation after an inmate reported the inability to have a bowel movement and stomach pain).

Although Thomas submitted a sick-call slip for numbness in her extremities the same day that Nurse Collins reported that she appeared healthy, Thomas has not established that she raised that concern with Nurse Collins during his assessment and she does not dispute that she was seen by Nurse Brand regarding that sick-call slip the following day.

Thomas's Response to the SHP Defendants' Motion for Summary Judgment focuses on the evidence she has amassed to indicate that, according to an expert,[16] her medical records were altered. (Doc.

---

[16] The SHP Defendants' Motion to Exclude Nurse Crous's Testimony is addressed separately below.

120 at 28-29). The parties agree that Head Nurse Thoman deleted some documents from Thomas's medical record on February 25, 2020, including progress notes authored by Nurse Collins, although the SHP Defendants contend that she only deleted blank or duplicative records. (*Id.*; Doc. 95-3, Crous Report ¶¶ 25-29; Doc. 122, Collins Dep. at 33:13-34:1; Doc. 125, Thoman Dep. at 65:3-24, 68:14-70:11). However, it is also undisputed that Nurse Collins did not have the ability to delete medical records, whether authored by him or by someone else. (Doc. 122, Collins Dep. at 34:2-6).

Accordingly, evidence that someone else deleted portions of Thomas's medical record, whether blank or not, after she was hospitalized has no bearing on whether Nurse Collins acted with deliberate indifference to her serious medical need. *See May v. Akers*, No. 5:21-182-DCR, 2023 WL 2611034, at *9 (E.D. Ky. Mar. 23, 2023) (finding that altering medical records to mislabel a diagnosis does not demonstrate deliberate indifference in the absence of other evidence). Thomas has not alleged that those deleted medical records would provide any evidence that Nurse Collins was aware of any facts indicating that she had a spinal abscess.

Further, even if evidence that a dictation lock was taken off of certain records or that other records were missing "insert" and "print" functions established that someone altered those documents, (*see* Doc. 120 at 28-29), Thomas has neither established

that Nurse Collins was the person who altered those records nor that those alterations indicate that he was or should have been aware of her serious medical need. Similarly, Thomas's allegation that Nurse Collins accessed her medical records after she was no longer under SHP's care does not demonstrate that he acted with deliberate indifference while caring for Thomas, even if his actions may have been contrary to proper nursing practice. (*See id.* at 29; Doc. 95-3, Crous Report ¶ 10).

Because Thomas has failed to establish that Nurse Collins was or should have been aware of an excessive risk to Thomas's health or safety, he is entitled to summary judgment regardless of whether the Court applies the Fourteenth or Eighth Amendment standard.

### b. Nurse Brand

Nurse Brand interacted with Thomas twice. First, on February 5, Nurse Brand responded to Thomas's sick-call slip for numbness in her arms and legs. (Doc. 98-8 at 60–64). Nurse Brand noted that Thomas's vital signs were normal, but that she had pain with movement and with and without weight bearing. (*Id.* at 63). Her examination also revealed that Thomas had a decreased or limited range of motion. (*Id.*). However, Nurse Brand determined that there was no need to contact Dr. Suetholz. (*Id.*). Instead, she instructed Thomas on the "importance of exercise and continued mobility" and told her to return to sick-call if her condition worsened or failed

to improve. (*Id.*). Thomas ultimately signed a Release of Information to allow SHP to obtain her previous medical records. (*Id.*).

Five days later, on February 10, Nurse Brand responded to another sick-call slip submitted by Thomas, which reported the same symptoms: numbness in her arms and legs. (*Id.* at 72-73, 75). This time, Nurse Brand's progress note reflected that Thomas's "records . . . from St. Elizabeth were pulled and will be reviewed with [Dr. Suetholz]." (*Id.* at 75). Nurse Brand noted that Thomas had a "normal gait," but that she was now also complaining of back pain. (*Id.*). Although Nurse Brand wrote that Thomas "was treated for her back pain 5 days ago on 2/5/2020," she testified during her deposition that Thomas's back pain had not been previously documented in her chart and she could not recall what treatment she was referring to in her progress note. (*Id.*; Doc. 124, Brand Dep. at 49:3-50:6).

When viewed in the light most favorable to Thomas, these facts show that Nurse Brand was aware of and inferred a substantial risk of serious harm to Thomas. In *Smith*, a court in this District held that a reasonable jury could find that a nurse inferred a substantial risk of harm to the plaintiff when she recorded his complaints of lower extremity numbness and pain during two examinations, four days apart. 2019 WL 1338895, at * 16. Similarly,

Nurse Brand recorded Thomas's complaints of numbness and pain in her arms and legs on two occasions, five days apart.

Just as in this case, the plaintiff in *Smith* was ultimately diagnosed with a spinal abscess, which resulted in paraplegia. *See id.* at *9. Although the SHP Defendants contend that a failure to diagnose such a "rare phenomenon" with an "atypical presentation" cannot amount to deliberate indifference, (Doc. 98 at 24, 27), the *Smith* court found that a plaintiff's complaints of the same symptoms, numbness in the lower extremities, trouble walking, and back pain, caused by the same condition, a spinal abscess, were sufficient to conclude that a nurse was aware of and inferred a substantial risk of serious harm. *See* 2019 WL 1338895, at *9, *16. Accordingly, that Nurse Brand may not have known that Thomas had a spinal abscess is not dispositive because she knew that Thomas had symptoms that indicated a substantial risk of serious harm.

While Thomas has not introduced direct evidence that Nurse Brand actually drew the inference that Thomas was facing a substantial risk of harm, that is not dispositive either because, "[f]or summary-judgment purposes, it is sufficient that 'defendants *could* have perceived a substantial risk of serious harm to [plaintiff]. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial.'" *See id.* (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006)).

Thomas's expert, Dr. Bazzel,[17] opined that on February 9 or 10, someone who had been trained as an LPN, like Nurse Brand, should have either called the medical director or transferred Thomas to the emergency department, based on the numbness and weakness in her arms and legs. (Doc. 101-1, Bazzel Dep. at 39:22–40:1, 41:2–22). Based on this evidence, a reasonable jury could find that Nurse Brand perceived a substantial risk of serious harm to Thomas.

As to whether Nurse Brand disregarded the risk she perceived, courts in this Circuit find "deliberate indifference on the part of medical staff under . . . circumstances only where 'medical care . . . is so cursory as to amount to no treatment at all.'" *See Winkler v. Madison Cnty.*, 893 F.3d 877, 892 (6th Cir. 2018) (quoting *Terrance*, 286 F.3d at 843–44). Here, despite Nurse Brand's note that Thomas had been treated for back pain, there is no evidence in Thomas's medical record or otherwise of that occurring. Moreover, Nurse Brand did not attempt to alleviate Thomas's other symptoms, which included pain and numbness in her arms and legs and a reduced range of motion, in any way, even after Thomas displayed those symptoms to her twice.

Although Nurse Brand began the process to obtain Thomas's prior medical records and instructed her on the importance of exercise, neither of those actions could be considered medical

---

[17] The SHP Defendants' Motion to Exclude Dr. Bazzel's Testimony is addressed separately below.

treatment. While the SHP Defendants argue that "it is undisputed that [Nurse Brand] assessed and treated the Plaintiff," (Doc. 98 at 25), Thomas actually contends that she received "no care" for her neurological issues, (Doc. 120 at 37). The SHP Defendants have not pointed to any evidence to support their argument, let alone evidence from which the Court could conclude that there is no genuine dispute of material fact as to whether Nurse Brand treated Thomas. Accordingly, a reasonable jury could find that the medical care Nurse Brand provided to Thomas amounted to "no treatment at all." *See Winkler*, 893 F.3d at 892.

Nurses, unlike doctors, are "not licensed to independently diagnose conditions, devise treatment plans, or prescribe medicine." *Hamilton v. Pike Cnty., Ky.*, No. 11-99-ART, 2013 WL 529936, at *12 (E.D. Ky. Feb. 11, 2013). However, this does not mean that a nurse may not be held liable for failing to respond at all to an inmate's serious medical condition. When a nurse passes information about a patient's symptoms onto a physician, liability for deliberate indifference will generally not attach. *See Winkler*, 893 F.3d at 894-95. However, where a nurse "conceal[s]" an inmate's complaints from a doctor, summary judgment on a § 1983 claim is not appropriate. *See Hamilton*, 2013 WL 529936, at *13.

Nurse Brand testified that she never contacted Dr. Suetholz about reviewing Thomas's medical records. (Doc. 124, Brand Dep. at 50:21-25, 51:10-14). Although she testified that she "would have

told" Head Nurse Thoman that she requested records for Dr. Suetholz's review, that is not definitive evidence that she did so. (*See id.* at 51:5-9). Further, there is no evidence that she reported any of Thomas's specific symptoms or any concerns she had about Thomas's condition to anyone. Thus, as in *Hamilton*, it is not clear as a matter of law that Nurse Brand acted reasonably in response to the risk she perceived. *See also Sours*, 593 F. App'x at 485.

Because a reasonable jury could find that Nurse Brand knew of and disregarded a substantial risk to Thomas's health or safety, making her liable under the Eighth Amendment standard, it could also find her liable under the more lenient Fourteenth Amendment standard. Thus, Nurse Brand is not entitled to summary judgment on Thomas's claim against her.

### c. Nurse Troendle

Nurse Troendle was involved in Thomas's medical care on four occasions. First, on January 27, 2020, she attempted to respond to Thomas's initial sick-call slip for constipation. (Doc. 98-8 at 37). Nurse Troendle documented that Thomas refused to come up to be assessed that day when her name was called. (*Id.*).

However, Thomas's experts take issue with that alleged documentation. Nurse Crous opined that Nurse Troendle's note was likely fabricated because it was created almost a month later,

after Thomas had been transferred to the hospital and on the same day that Nurse Troendle was terminated from SHP. (Doc. 120 at 30; Doc. 95-3, Crous Report ¶¶ 7-8). Nurse Goehring also noted that the documentation was not in line with SHP policy because, among other reasons, a refusal form was missing from the record. (Doc. 84-1, Goehring Report at 17).

Nonetheless, Nurse Troendle cannot be liable for deliberate indifference based on that conduct. As discussed above, even assuming that the medical record was altered in the manner Thomas alleged, that does not establish that Nurse Troendle was or should have been aware of Thomas's serious medical need while she was responsible for her medical care. Although Nurse Troendle was aware that Thomas had submitted one sick-call slip for constipation, that does not mean that she was aware Thomas was suffering from a serious medical need. *See Spar v. Mohr*, No. 2:14-CV-546, 2015 WL 5895914, at *7-8 (S.D. Ohio Oct. 9, 2015), *report and recommendation adopted*, 2015 WL 6506557 (S.D. Ohio Oct. 28, 2015) (collecting cases) (finding that, while some courts have concluded otherwise, *chronic* constipation could be a serious medical need where it is accompanied by other severe symptoms such as abdominal pain, chills, and vomiting).

Further, Nurse Troendle's failure to comply with SHP policy does not equate to a per se constitutional violation. *See Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022) (citing *Winkler*, 893

F.3d at 891) (finding that failure to follow internal policies, without more, is not deliberate indifference). Thomas agrees that she was seen and successfully treated in response to that sick-call slip by Nurse Collins the following day. (*See* Doc. 98-8 at 38–42; Doc. 103-1, Thomas Dep. at 74:12–15). Thus, her injuries were not the result of Nurse Troendle's failure to treat her on January 27. *See Horn*, 22 F.3d at 659.

Second, on February 17, Nurse Troendle responded to Thomas's sick-call slip from the previous day for constipation. (Doc. 98-8 at 101, 103-04). After examining Thomas, Nurse Troendle prescribed Docusate, a stool softener, to be taken daily and instructed Thomas to increase her water intake. (*Id.* at 103; Doc. 120 at 32). Although Nurse Goehring again opined that this course of treatment was contrary to SHP protocol, (Doc. 84-1, Goehring Report at 21–23), that alone cannot support Thomas's deliberate indifference claim because she has not established that administering a stool softener for complaints of constipation amounts to "[g]rossly inadequate medical care." *See Shadrick*, 805 F.3d at 744.

On February 21, Nurse Troendle again responded to Thomas's sick-call slip from the previous day for constipation. (Doc. 98-8 at 115-17). After an examination, Nurse Troendle prescribed a different medication, Milk of Magnesia, and educated Thomas on the importance of fiber and exercise. (*Id.* at 116). Despite Nurse Goehring's additional criticism of this course of treatment as

also being contrary to SHP nursing protocol, (Doc. 84-1, Goehring Report at 23), Thomas has also failed to establish that Nurse Troendle acted with deliberate indifference on that occasion, even if her continued complaints of constipation could be considered evidence of a serious medical need. Nurse Troendle did not disregard Thomas's need, but instead prescribed additional medication in an attempt to treat her constipation. This is not so cursory as to amount to "no treatment at all." *See Winkler*, 893 F.3d at 892.

However, Nurse Troendle's actions on the fourth day she interacted with Thomas, February 23, 2020, can support a deliberate indifference claim against her. That day, Correctional Officer Harris called Nurse Troendle to assess Thomas because she was complaining that she could not move her legs. (Doc. 98-8 at 129; Doc. 123, Troendle Dep. at 79:19-23). Nurse Troendle noted that Thomas's vital signs were within the normal range, she was "squirming around on the floor" while complaining that she had "no control of her legs," and her legs were stiff, but would bend when they were not being assessed. (Doc. 98 at 12; Doc. 98-8 at 129).

Nurse Troendle then decided to transfer Thomas to the medical isolation unit to await Dr. Suetholz's scheduled visit the next day. (Doc. 98 at 25; Doc. 123, Troendle Dep. at 80:16-19). She questioned whether Thomas's symptoms could be due to a pinched nerve. (Doc. 98-8 at 129; Doc. 123, Troendle Dep. at 80:19-20).

Nurse Troendle decided to transport Thomas to the medical unit in a wheelchair, but testified that, at the time, she didn't "know whether [Thomas] could walk or not." (Doc. 123, Troendle Dep. at 81:16-20). Once they arrived at Thomas's new cell, Thomas slid out of the wheelchair and onto the floor. (*Id.* at 92:15-93:3).

Nurse Troendle returned three times that day to check on Thomas. (Doc. 98-8 at 131). She documented that Thomas was still lying on the floor and complaining of immobility, but that she could move her legs and bend her knees. (*Id.*). Thomas testified that Nurse Troendle's documentation was correct: she could move her legs, but she was unable to stand or bear her own weight. (Doc. 103-1, Thomas Dep. at 88:25-89:11).[18] Nurse Troendle also noted that Thomas had urinated on herself because she "didn't make it to the toilet," but Nurse Troendle did not consider that to be a neurological symptom. (Doc. 98-8 at 131; Doc. 123, Troendle Dep. at 108:9-22). It is undisputed that Nurse Troendle did not contact

---

[18] Thomas also submitted an Inmate Grievance Form that day in which she wrote, "I walk on my own." (Doc. 108-1 at 2). Although Thomas now argues that she meant to write, "I *can't* walk on my own," (Doc. 120 at 10; Doc. 120-7, Thomas Decl. ¶¶ 3-4), there is no evidence that Nurse Troendle or any other SHP provider reviewed or made decisions regarding Thomas's treatment on the basis of that Grievance Form. Accordingly, the Court will not consider that statement in its evaluation of the subjective component of Thomas's deliberate indifference claim. However, contrary to the SHP Defendants' argument, (Doc. 131 at 1-2), the Court need not strike Thomas's Declaration as a "sham affidavit" because it does not directly contradict her *sworn* testimony. *See Reed v. City of Memphis, Tenn.*, 735 F. App'x 192, 197-98 (6th Cir. 2018) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). The Inmate Grievance Form is not sworn testimony and Thomas testified at her deposition that she could move her legs on February 23, not that she could walk, (*see* Doc. 103-1, Thomas Dep. at 92:25-93:3, 95:1-5).

Dr. Suetholz regarding Thomas at any point that day. (*See* Doc. 123, Troendle Dep. at 81:10-12, 106:18-20, 108:18-22).

Based on this evidence, a reasonable jury could find that Nurse Troendle drew an inference that Thomas was subject to a substantial risk of serious harm. In *Smith*, a court in this District held that a reasonable jury could find that a nurse who was repeatedly told than an inmate could not walk, including by a correctional officer, and who personally witnessed that inmate complain of numbness and the inability to walk was aware that the inmate was suffering from a serious medical problem. 2019 WL 1338895, at *18. In *Taylor*, the Sixth Circuit similarly held that incontinence and immobility "were clear symptoms of a serious problem, even if Defendants did not cho[o]se to believe Plaintiff." 104 F. App'x at 538.

Here, Nurse Troendle was told by Correctional Officer Harris and by Thomas that she could not walk. Deputy Matthews also reported that, on February 23, she told Nurse Troendle about Thomas's "persistent immobility" and incontinence, but that Nurse Troendle claimed that "she did not believe the extent of Ms. Thomas's reported symptoms." (Doc. 83-16, Matthews Interrogatories ¶ 3). As in *Smith* and *Taylor*, this is sufficient for a reasonable jury to conclude that Nurse Troendle knew of an excessive risk to Thomas's health and safety even if she did not actually conclude that the cause of Thomas's symptoms was a spinal abscess.

Further, although Nurse Troendle noted that Thomas may have had a pinched nerve, such a generic diagnosis cannot "serve as blanket insulation from liability." *See Howell v. NaphCare, Inc.*, 67 F.4th 302, 314 (6th Cir. 2023) (finding that a nurse was not entitled to summary judgment where she misdiagnosed a sickle cell crisis as a "psychiatric episode," but was faced with inconsistent symptoms and failed to undertake additional evaluation, care, or treatment).

If the parties dispute whether a defendant actually believed that an inmate was faking his or her symptoms, a jury must resolve the issue. *Smith*, 2019 WL 1338895, at *15 (collecting cases); *see also Brookes v. Shank*, 660 F. App'x 465, 469 (6th Cir. 2016) (finding that a physician was not entitled to summary judgment because there was a genuine question of fact as to whether he was motivated by a sincere concern that an inmate was a drug seeker). Nurse Troendle denied telling Deputies that she believed Thomas was faking her symptoms but admitted that she told Head Nurse Thoman that she did not call Dr. Suetholz because she believed Thomas could walk. (Doc. 123, Troendle Dep. at 117:8-23, 120:3-16). Nurse Troendle testified that Thomas had told her that "she couldn't walk, but then later . . . said she can walk, that it just hurts when she walks." (*Id.* at 117:16-25).

However, a jury must decide whether Nurse Troendle subjectively believed that Thomas was experiencing immobility in

light of her undisputed awareness of Thomas and the Deputies' complaints. *See Taylor*, 104 F. App'x at 538; *Smith*, 2019 WL 1338895, at *15. There is a genuine issue of fact as to whether Thomas told Nurse Troendle that she could walk on February 23 and whether, even if she did, Nurse Troendle believed, at any point, that she could not based on her assessment of the situation.

Because the facts indicate that Nurse Troendle could have perceived a substantial risk of serious harm to Thomas, a triable issue remains as to whether she actually did perceive or infer such a risk. *See Clark-Murphy*, 439 F.3d at 290 (citing *Farmer*, 511 U.S. at 842); *see also Hall v. Kenton Cnty., Ky.*, No. 2:19-00054 (WOB-CJS), 2022 WL 2442199, at *8 (E.D. Ky. July 5, 2022), *aff'd sub nom. Hall v. Carl*, No. 22-5702, 2023 WL 2553861 (6th Cir. Mar. 17, 2023) (collecting cases) ("[A] jury is entitled to discredit the credibility of a defendant who claims that he or she did not perceive a substantial risk of serious harm to a prisoner.").

Similarly, a reasonable jury could find that Nurse Troendle disregarded the risk of harm she perceived. It is undisputed that she did not attempt to alleviate Thomas's immobility or incontinence, but merely transferred her to medical isolation and continued to monitor her while she awaited Dr. Suetholz's scheduled visit the following day. Nurse Troendle never contacted Dr. Suetholz or attempted to transfer Thomas to the hospital. A

reasonable jury could find that this course of action amounted to "no treatment at all." *See Winkler*, 893 F.3d at 892.

Although the Sixth Circuit has held that transferring an inmate to an observation cell for monitoring can be sufficient treatment, that is only true in cases where such a transfer is an attempt to alleviate some of the risks of harm to the inmate. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 441, 449 (6th Cir. 2014) (finding that a medical assistant did not deliberately ignore an inmate's medical needs after he experienced a change in mental status because she placed him in an observation cell, which prevented him from being a danger to himself or others). Here, unlike the risks posed by the inmate's mental health symptoms in *Rouster*, Thomas's immobility and incontinence could not be addressed via isolation and observation. Instead, Thomas continued to experience the same symptoms and the same risk of harm regardless of which cell she was placed in.[19] A reasonable jury could find that Nurse Troendle "consciously acted unreasonably in response to [a] known risk." *See Sours*, 593 F. App'x at 485.

---

[19] Thomas actually argues that she experienced more harm in medical isolation than she would have in her regular cell because she had a "collegial support system" when she was housed with other inmates, who helped her move around. (Doc. 101-1, Bazzel Dep. at 58:19-59:6; Doc. 120 at 31).

Accordingly, Nurse Troendle is not entitled to summary judgment on Thomas's claim against her regardless of whether the Court applies the Eighth or the Fourteenth Amendment standard.

### d. Head Nurse Thoman

Thomas agrees that she had only one documented encounter with Head Nurse Thoman: when Head Nurse Thoman evaluated her and then sent her to the hospital on February 24, 2020. (Doc. 120 at 26; Doc. 98-8 at 140). Thomas does not contend that Head Nurse Thoman's decision to call an ambulance was the result of deliberate indifference.

Instead, Thomas focuses on three other alleged aspects of Head Nurse Thoman's conduct: (1) that her fellow inmate Jervis testified to seeing Head Nurse Thoman take her blood pressure; (2) that Head Nurse Thoman was aware of the need for Dr. Suetholz to review her medical records, but failed to contact him; and (3) that Head Nurse Thoman accessed and deleted portions of her medical record after she had been transported to the hospital. (Doc. 120 at 26-28). Each of Thomas's arguments will be analyzed below.

Jervis's testimony fails to establish that Head Nurse Thoman was or should have been aware of a substantial risk of harm to Thomas's health or safety. Jervis stated that she remembered Head Nurse Thoman taking Thomas's blood pressure and that she "said that she would make an appointment with the doctor, but it never

did happen." (Doc. 105-35, Jervis Decl. ¶¶ 15–16). Although Jervis did not specify when she saw Head Nurse Thoman interact with Thomas, she was housed with Thomas between January 30 and February 6. (Doc. 83-10 at 7; Doc. 120 at 26).

This is not enough evidence for a reasonable jury to conclude that Head Nurse Thoman should have been aware of symptoms indicating that Thomas had a serious medical condition. Neither Jervis nor Thomas testified that Thomas told Head Nurse Thoman about any relevant symptoms or that her examination revealed anything that should have alerted her to Thomas's spinal abscess.

Thomas has also failed to establish that Head Nurse Thoman's failure to contact Dr. Suetholz to review her prior medical records constitutes deliberate indifference to a serious medical need. Nurse Brand, who requested Thomas's hospital records, testified that she did not contact Dr. Suetholz to review them, but that she "believe[d]" that Head Nurse Thoman "would have done that" and that she "would have told [Head Nurse Thoman] when the records were requested that these probably need to be looked over by the doctor." (Doc. 124, Brand Dep. at 50:21–51:9).

Although this is not definitive evidence that Nurse Brand did tell Head Nurse Thoman that she had requested records for Dr. Suetholz's review, even if it was, the mere fact that Nurse Brand requested medical records was not enough information to inform Head Nurse Thoman that Thomas had a serious medical need. It is

undisputed that, other than Jervis's testimony regarding Head Nurse Thoman taking Thomas's blood pressure, there is no evidence that Head Nurse Thoman interacted with Thomas, reviewed her medical records, or observed any of her symptoms until the morning she sent her to the hospital. (*See* Doc. 125, Thoman Dep. at 19:20-20:12, 23:23-24:18). There is no evidence that Nurse Brand or anyone else reported any information regarding Thomas's symptoms or condition to Head Nurse Thoman.[20]

In *Comstock v. McCrary*, the Sixth Circuit held that a doctor's failure to supervise a physician's assistant was not deliberately indifferent because he did not authorize, approve, or knowingly acquiesce in unconstitutional conduct. 273 F.3d 693, 698-99, 712-13 (6th Cir. 2001) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Importantly, the doctor in *Comstock* never met with the inmate being treated or looked at his medical records, although he did sign off on a progress note. *Id.* at 699.

Similarly, Head Nurse Thoman cannot be liable for the potentially unconstitutional conduct of any of her subordinates because she lacked knowledge of facts that could have indicated Thomas's condition. Even if Head Nurse Thoman's failure to contact Dr. Suetholz was a violation of SHP policy, that failure was not

---

[20] Although Nurse Troendle did notify Head Nurse Thoman via a phone call that she had moved Thomas to medical isolation on February 23, that call was limited to Nurse Troendle's statements that "she did everything right and there was nothing really wrong with Georgia Thomas." (Doc. 125, Thoman Dep. at 19:7-19).

a reckless act in the face of an unjustifiably high risk of harm that was or should have been known to her. *See Hyman*, 27 F.4th at 1238.

Finally, Head Nurse Thoman's deletion of some of Thomas's medical records and her alleged alteration of others also fails to establish that she acted with deliberate indifference. The fact that she deleted some records on February 25, after Thomas was under the care of the hospital, does not establish that her prior treatment of Thomas had been deliberately indifferent. (*See* Doc. 120 at 27; Doc. 125, Thoman Dep. at 80:21–81:2).

Similarly, even assuming that evidence that Head Nurse Thoman accessed Thomas's medical records on February 24, February 25, March 24, and at some point in November 2020, amounted to more than a conclusory allegation that she altered those records, (*see* Doc. 120 at 27–28; Doc. 120-5 at 4–6), such post hoc alteration is not evidence from which a reasonable jury could find that Head Nurse Thoman acted with deliberate indifference while she was responsible for Thomas's medical care. *See May*, 2023 WL 2611034, at *9. Further, Thomas cannot establish that those alterations and deletions caused her injuries. *See Horn*, 22 F.3d at 659.

Because there is no evidence from which a reasonable jury could conclude that Head Nurse Thoman acted deliberately and recklessly in the face of an unjustifiably high risk of harm that she was or should have been aware of under the Fourteenth Amendment

test, her actions cannot satisfy the more stringent Eighth Amendment test either. Thus, she is entitled to summary judgment on Thomas's claim against her.

### e. Dr. Suetholz

The parties agree that Dr. Suetholz never personally interacted with Thomas. (Doc. 98 at 33; Doc. 103-1, Thomas Dep. at 165:1-7). Instead, Thomas bases her claim against Dr. Suetholz on two alleged facts: (1) that he signed off on Thomas's initial health evaluation on February 5, 2020; and (2) that he should have been contacted to review Thomas's medical records. (Doc. 120 at 25). Neither can support Thomas's deliberate indifference claim against him.

First, Thomas has failed to explain how the fact that Dr. Suetholz signed off on Nurse Collins's initial health evaluation, (*see* Doc. 98-8 at 49-50), indicates that he was or should have been aware of a substantial risk of harm to her. As discussed above, Nurse Collins's assessment reflected that Thomas was a "[h]ealthy appearing adult in no acute distress" and did not indicate that she was experiencing any symptoms of a serious health condition. (*See id.*). Accordingly, no reasonable jury could find that this evidence creates a genuine issue of material fact as to whether Dr. Suetholz did perceive or should have perceived an unjustifiably high risk of harm.

66

Second, Thomas has not introduced any evidence to establish, beyond mere conjecture, that Dr. Suetholz ever reviewed her St. Elizabeth medical records. Indeed, Dr. Suetholz testified that he had not viewed her chart at any point before she was transported to the hospital on February 24, 2020, and that no member of SHP staff asked him to review her chart during her incarceration. (Doc. 97, Suetholz Dep. at 12:16-22, 13:3-8). He also noted that he could not recall reviewing or being asked to review any of Thomas's St. Elizabeth medical records prior to her hospitalization. (*Id.* at 22:4-12, 23:1-7).

Thomas argues that, based on Nurse Brand's testimony, Nurse Brand "would have told Defendant Thoman that the records needed to be reviewed and Defendant Thoman would have contacted Dr. Suetholz." (Doc. 120 at 25; Doc. 124, Brand Dep. at 50:21-51:9). However, Head Nurse Thoman testified that either the nurse who responded to the sick-call or the nurse who obtained the outside medical records was responsible for contacting Dr. Suetholz to review the records if they had concerns. (Doc. 125, Thoman Dep. at 45:2-19, 46:3-11).

This is insufficient evidence from which a reasonable jury could conclude that Dr. Suetholz actually did review Thomas's medical records. Even if, pursuant to SHP policy, one of the nurses should have contacted Dr. Suetholz, Thomas has not introduced any evidence to indicate that any of them did. Rather, each nurse who

was deposed testified that someone else should have called him, but none testified to doing so themselves.

Likewise, Thomas's CorrecTek medical record does not reflect that Dr. Suetholz reviewed anything other than her initial evaluation. Thomas's bare conjecture that, because policy dictated that someone should have asked Dr. Suetholz to review the records, he actually did, is insufficient to allow her claim against him to survive summary judgment. *See Arendale*, 519 F.3d at 605. Similarly, Dr. Suetholz cannot be liable for the conduct of any of his subordinates because he did not authorize, approve, or knowingly acquiesce in any unconstitutional conduct. *See Comstock*, 273 F.3d at 712–13.

There is no evidence from which a reasonable jury could find that Dr. Suetholz was or should have been aware of a substantial risk to Thomas's health or safety while SHP was responsible for her medical care. Accordingly, he is entitled to summary judgment under both the Fourteenth and Eighth Amendment standards.

### *f. SHP*

Next, SHP contends that it is entitled to summary judgment on Thomas's failure to train claim. (Doc. 98 at 33–34). In response, Thomas concedes that she has not established that SHP failed to train its employees. (Doc. 120 at 38). Accordingly, SHP is entitled to summary judgment on that claim.

68

However, Thomas also notes that SHP did not argue that it is entitled to summary judgment on her deliberate indifference claim against it pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), regarding its unconstitutional policies, practices, and customs, which is reflected in Count II of her Complaint. (*See id.*; Doc. 1 ¶¶ 71-76). Indeed, the SHP Defendants did not address Thomas's *Monell* claim regarding SHP's policies, procedures, and customs in either their Motion for Summary Judgment or their Reply in Support of their Motion for Summary Judgment, even after Thomas raised this argument in her Response.

It is well-settled that, in the context of a motion for summary judgment, "[t]he burden of demonstrating the absence of a genuine dispute of material fact first rests with the moving party." *George v. Youngstown State Univ.*, 996 F.3d 446, 458 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Because the SHP Defendants have not even attempted to meet their burden with respect to Thomas's *Monell* claim against SHP for its policies, procedures, and customs, SHP is not entitled to summary judgment on that claim.

### g. Causation

The SHP Defendants also argue that Thomas has failed to establish that their conduct was the proximate cause of her residual neurological deficits. (Doc. 98 at 28). Indeed, the Sixth

Circuit has held that proximate causation is an essential element of a § 1983 claim for damages. *Horn*, 22 F.3d at 659 (citing *Doe*, 956 F.2d at 550).

A plaintiff must submit verifying medical evidence of harm to establish that a delay in treatment caused his or her injuries when a "'deliberate indifference' claim is based on the prison's failure to treat a condition adequately or where the prisoner's affliction is seemingly minor or non-obvious." *Blackmore*, 390 F.3d at 898 (citing *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)). To present "verifying medical evidence," a plaintiff must usually introduce expert medical testimony to establish that the treatments the defendants administered were inadequate. *Rhinehart v. Scutt*, 894 F.3d 721, 737-38 (6th Cir. 2018) (citing *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)). However, a plaintiff does not need verifying medical evidence if the defendant "'provided treatment so cursory as to amount to no treatment at all.'" *Est. of Majors v. Gerlach*, 821 F. App'x 533, 540 (6th Cir. 2020) (quoting *Rhinehart*, 894 F.3d at 737).

As discussed above, a reasonable jury could find that Nurses Brand and Troendle "provided treatment so cursory as to amount to no treatment at all." *See id.* Accordingly, Thomas need not introduce verifying medical evidence to establish that the remaining SHP Defendants' actions caused her harm. A reasonable

jury could conclude that Nurses Brand and Troendle's failure to respond to Thomas's complaints was the proximate cause of her worsened condition.

However, even if verifying medical evidence was required, Thomas has presented that too. Thomas's expert, Dr. Bazzel, opined that, based on the symptoms Thomas demonstrated on February 9 or 10, an LPN, like Nurses Brand and Troendle, should have either called the medical director or transferred Thomas to the emergency department. (Doc. 101-1, Bazzel Dep. at 39:22-40:1, 41:2-22). Similarly, Dr. Bjerke[21] testified that Thomas had relevant symptoms as early as December 2019 and that, in his opinion, her spinal infection began then. (Doc. 100-1, Bjerke Dep. at 38:10-22). He noted that, "if surgery had been performed before [her] dramatic increase in tone and bowel and bladder dysfunction, she may have had a different result, more likely than not." (*Id.* at 83:17-25).

Although the SHP Defendants point out that Dr. Bazzel cannot establish what an MRI would have shown if Thomas had been transferred to the hospital earlier than she was, (*see* Doc. 98 at 30; Doc. 101-1, Bazzel Dep. at 66:12-15), it is necessarily true that no one could definitively state what an MRI *would have shown* before Thomas's transfer because it is undisputed that Thomas did not receive an MRI until she actually was transferred. Similarly,

---

[21] The SHP Defendants' Motion to Exclude Dr. Bjerke's testimony is addressed separately below.

Dr, Bjerke's admissions that he could not conclusively establish exactly when the infectious process started based on the limited evidence in Thomas's medical record or what an MRI would have shown at various points prior to her hospitalization, (*see* Doc. 100-1, Bjerke Dep. at 43:25–45:13), are not fatal to Thomas's claims. Thomas's inability to elicit definite testimony regarding information no one could possibly know does not mean that her claims must fail at the summary judgment stage.

The SHP Defendants also point out that Dr. Bjerke testified that, once Thomas developed urinary incontinence, she was unlikely to improve regardless of when she underwent surgery. (*Id.* at 55:22–23; Doc. 98 at 29). However, they do not dispute that Nurses Brand and Troendle each had the opportunity to transfer Thomas to the hospital before Nurse Troendle documented her incontinence for the first time on the evening of February 23, 2020. (*See* Doc. 98-8 at 131). While the SHP Defendants contend that "there was no reason to [transfer] her any earlier" than they did, (Doc. 98 at 30), there is at least a genuine issue of material fact as to whether Nurses Brand and Troendle acted with deliberate indifference by failing to treat Thomas's numbness, back pain, and trouble walking.

Thomas has introduced expert medical testimony from which a reasonable jury could conclude that Nurses Brand and Troendle inadequately treated her condition and that their failure to transfer her to the hospital proximately caused her residual

neurological deficits. *See Rhinehart*, 894 F.3d at 737–38. For the purposes of summary judgment, Thomas has satisfied the causation element of her claims.

### h. Punitive Damages

Finally, the SHP Defendants argue that Thomas has failed to provide evidence to warrant punitive damages. (Doc. 98 at 34). Punitive damages are available in § 1983 actions where the defendant's actions were "motivated by evil motive or intent" or where they involve "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

The Sixth Circuit has held that the subjective recklessness standard that constitutes the test for deliberate indifference under the Eighth Amendment is "consistent" with the standard for punitive damages and "that much of the evidence bearing on the one question bears on the other." *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (citing *Farmer*, 511 U.S. at 839–40).

Accordingly, because a reasonable jury could conclude that Nurses Brand and Troendle's conduct satisfies the Eighth Amendment's "subjective recklessness" standard for the reasons discussed above, it could also conclude that their conduct meets the standard for punitive damages. Thus, the remaining SHP

Defendants are not entitled to summary judgment on Thomas's claims for punitive damages.

### B. Motions to Strike or Exclude Expert Testimony

Courts analyze the admissibility of an expert's testimony under the framework set out by Federal Rule of Evidence 702. Rule 702 states that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he district court has a 'gatekeeping role' in screening expert testimony to ensure that only reliable testimony and evidence go to the jury." *United States v. Gissantaner*, 900 F.3d 457, 463 (6th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

There are currently six pending Motions to Strike or Exclude Expert Testimony in this matter: (1) the Deputy Defendants' Motion to Strike the Opinion of Nurse Angela Goehring, (Doc. 84); (2) the SHP Defendants' Motion to Exclude the Testimony of Dr. Benjamin Bjerke, (Doc. 93); (3) the SHP Defendants' Motion to Exclude the Testimony of Dr. Grady Bazzel, (Doc. 94); (4) the SHP Defendants'

Motion to Exclude the Testimony of Nurse Kathryn Crous, (Doc. 95); (5) Plaintiff's Motion to Strike the Testimony of Ms. Alyssa Rhodes, (Doc. 92); and (6) Plaintiff's Motion to Strike the Testimony of Dr. Jeffrey Wang, (Doc. 99). The Court will address each separately below.

### i. Nurse Angela Goehring

Because, as discussed above, summary judgment will be granted on all of Plaintiff's claims against the Deputy Defendants, the Deputy Defendants' Motion to Strike the Opinion of Nurse Angela Goehring will be denied as moot.[22]

### ii. Dr. Benjamin Bjerke

Dr. Benjamin Bjerke is a board-certified spine surgeon who was retained by Thomas to provide opinions on appropriate spine care. (Doc. 93-1, Bjerke Report at 2; Doc. 114 at 1). The SHP Defendants contend that three of Dr. Bjerke's opinions should be excluded: (1) that earlier surgical intervention would have led to an improved neurological outcome for Thomas; (2) that Thomas's current level of disability is unlikely to improve; and (3) that Thomas will require ongoing and lifelong medical treatment as a result of her spinal infection. (Doc. 93 at 2). The SHP Defendants argue that Dr. Bjerke's opinions are unreliable because they are

---

[22] The SHP Defendants have not moved to exclude Nurse Goehring's testimony against them.

75

not based on sufficient facts or data and they are inherently speculative. (*Id.* at 6-9).

First, the SHP Defendants contend that Dr. Bjerke cannot offer an opinion on Thomas's current level of disability, whether it is likely to improve, whether earlier surgical intervention would have restored neurological dysfunction, and whether Thomas needs lifelong medical care because he admitted that he has no knowledge of her current disability status. (*Id.* at 6-7). Dr. Bjerke never examined Thomas. (Doc. 100-1, Bjerke Dep. at 24:1-3). He also testified that he doesn't "know of much of [Thomas's] current function, including bowel and bladder function today," he doesn't know whether Thomas is currently able to stand or walk, and that he "do[esn't] know anything" regarding Thomas's current ability to perform the daily activities of living. (*Id.* at 69:15-17, 78:9-12, 84:16-19). Dr. Bjerke also noted that he was "not going to opine independently on [Thomas's] current function" and that he does not know her current level of disability. (*Id.* at 78:17-18, 84:10-15).

However, this testimony does not establish that the first and second opinions the SHP Defendants seek to exclude are based on insufficient facts or data. Dr. Bjerke's opinion that earlier surgical intervention would have led to an improved neurological outcome for Thomas is based on his retrospective review of her medical records. (*Id.* at 83:12-14). He specifically reviewed her

MRI results, which indicated, in his opinion, an "advanced infectious process that had likely been present for several weeks." (Doc. 93-1, Bjerke Report at 21).

Moreover, at his deposition, Dr. Bjerke clarified that, because he lacks information about Thomas's current disability status, his opinion is not that an earlier surgery would have resulted in substantially less disability but that it would have resulted in "a more favorable outcome." (Doc. 100-1, Bjerke Dep. at 83:1-13). Dr. Bjerke's review of the medical records is sufficient to allow him to opine on the neurological outcome of Thomas's surgery. Any "'weaknesses in the factual basis of an expert witness'[s] opinion . . . bear on the weight of the evidence rather than on its admissibility'" and the SHP Defendants are free to raise those weaknesses during their cross-examination of Dr. Bjerke. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

As to his second opinion, Dr. Bjerke testified that his conclusion that Thomas's current level of disability is unlikely to improve was "theoretical" and based on an assumption that Thomas currently has some level of disability. (Doc. 100-1, Bjerke Dep. at 84:10-15, 84:20-85:9). Accordingly, his opinion amounts to a statement that, if Thomas is currently unable to control her bowel

and bladder or walk, she is unlikely to regain those functions. (*Id.* at 85:4-9).

"Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). Because Thomas has introduced other evidence, which the SHP Defendants do not contest, establishing that she is currently paraplegic and has no bladder or bowel control, (*see* Doc. 103-1, Thomas Dep. at 18:19-20, 103:4-7), she has sufficiently filled in the gaps left by Dr. Bjerke's testimony. Dr. Bjerke based his testimony on his review of Thomas's medical records and his knowledge that, "in general, neurologic injury is stable 12 to 18 months following the injury." (Doc. 100-1, Bjerke Dep. at 96:17-20). That is sufficient under Rule 702(b).

However, Dr. Bjerke's third opinion, that Thomas will require lifelong medical treatment, fares differently. At his deposition, he testified that, after further consideration, he doesn't know whether that opinion is correct because he doesn't know Thomas's "total dysfunction." (*Id.* at 91:2-17). He testified that he has not seen Thomas's complete set of medical records and he did not think that the life care plan he based that opinion on was an "accurate medical record." (*Id.*). Accordingly, because Dr. Bjerke

has admitted that he cannot confirm the accuracy of that opinion and he questions the veracity of the facts he based it on, the Court will exclude it.

Second, the SHP Defendants argue that Dr. Bjerke's first opinion, that earlier surgical intervention would have led to an improved neurological outcome for Thomas, is speculative and unreliable. (Doc. 93 at 7-9). In support of their argument, the SHP Defendants rely on a case that is not binding on this Court: *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). (*Id.* at 7-8). In *McDowell*, the Eleventh Circuit held that an expert could not testify to a vague "the earlier, the better" theory regarding treatment of a spinal abscess. 392 F.3d at 1299. That expert based his opinion on his common sense and a "universal axiom" that expedited treatment is preferable to delayed treatment, but the court noted that "the notion of early treatment is well within the common knowledge that would be obvious to the average juror . . . ." *Id.*

A court in this District, however, distinguished *McDowell* to find that an expert's testimony was admissible. *Chesnut v. United States*, No. 6:17-cv-00079-GFVT-HAI, 2019 WL 6879739, at *5 (E.D. Ky. Dec. 17, 2019). That court concluded that, while speculative "earlier, the better" testimony is generally inadmissible, an expert could give an opinion based on practical experience and

medical literature that even a diagnosis delayed by a day could result in a different outcome. *Id.*

Here, Dr. Bjerke's testimony is more like the specific opinion in *Chesnut* than the vague, common-sense conclusion propounded by the *McDowell* expert. Dr. Bjerke noted that literature on the subject of spinal cord decompression surgery suggests that it should be performed within twenty-four to seventy-two hours for traumatic injuries, but that for abscesses like Thomas's, medical "literature is much more broad and less specific with respect to surgical timing, but earlier is in general better." (Doc. 100-1, Bjerke Dep. at 18:6–9, 19:6–14). However, he also specifically noted that "if surgery had been performed before [her] dramatic increase in tone and bowel and bladder dysfunction, she may have had a different result, more likely than not." (*Id.* at 83:17–25). But once Thomas developed incontinence, she was unlikely to improve regardless of when she underwent surgery. (*Id.* at 55:22–23).

While Dr. Bjerke cannot know with certainty when Thomas's infectious process began or precisely what the outcome would have been if she had been transported to the hospital earlier, that is inherently true of any expert's testimony. No one can know what a test that was never administered would have shown or what would have happened under a hypothetical set of circumstances that never occurred. Dr. Bjerke's opinions are based on his knowledge, experience, and review of Thomas's medical records. Unlike the

80

opinion in *McDowell*, his conclusions are outside the common knowledge of an average juror. Thus, his opinion that an earlier surgical intervention would have led to an improved neurological outcome for Thomas is admissible. The proper method for the SHP Defendants to attack this opinion is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *See Daubert*, 509 U.S. at 596 (internal citation omitted).

In sum, the SHP Defendants' Motion to Exclude will be granted as to Dr. Bjerke's opinion that Thomas will require lifelong medical treatment, but otherwise denied.[23]

### iii. Dr. Grady Bazzel

Dr. Grady Bazzel is a physician whose practice centers exclusively on correctional medicine. (Doc. 94-1, Bazzel Report at 2). He was retained by Thomas to opine on appropriate medical care in correctional facilities. (Doc. 115 at 1). The SHP Defendants argue that Dr. Bazzel's opinion that earlier surgical intervention would have led to an improved neurological outcome for Thomas is speculative and unreliable. (Doc. 94 at 4–6).

Dr. Bazzel testified that, if Thomas had "been transported to the emergency room in a more timely manner, her outcome would have

---

[23] Although the above analysis of the SHP Defendants' Motion for Summary Judgment relies on some of Dr. Bjerke's opinions, it does not rely on the opinion that will be excluded.

been better," (Doc. 101-1, Bazzel Dep. at 33:3-5). He noted that, in his opinion, "she probably should have [been] transferred out somewhere around February 9th or 10th" based on the numbness in her arms and legs. (*Id.* at 33:24-34:8). However, he was unable to say whether earlier surgery would have resulted in Thomas regaining complete neurological function. (*Id.* 33:3-16). He noted that his opinion was based, in part, on his prior diagnosis of two inmates who had spinal abscesses and his post-treatment interactions with two other spinal abscess patients. (*Id.* at 13:10-16). He also based his opinion on information from peer-reviewed medical literature. (*Id.* at 17:2-22).

Just as with respect to Dr. Bjerke's similar opinion, Dr. Bazzel's testimony is admissible. Unlike the expert's opinion in *McDowell*, Dr. Bazzel's conclusion is specific and does not amount to vague restatement of "the earlier, the better." *See* 392 F.3d at 1299. Instead, like the expert in *Chesnut*, Dr. Bazzel used his knowledge and expertise to provide a specific timeframe within which a reasonable nurse should have secured additional medical care for Thomas, either by contacting the medical director or by transferring her to the hospital. (Doc. 101-1, Bazzel Dep. at 41:2-22). This conclusion is outside the knowledge of an average juror and would be helpful to the trier of fact's determination of whether the SHP Defendants acted with deliberate indifference.

82

That Dr. Bazzel cannot conclusively state what would have happened if Thomas had actually been transferred to the hospital earlier does not mean that his testimony is inadmissible. As discussed above, it would be impossible for anyone to determine with certainty what would have happened in a scenario that never occurred. Similarly, Dr. Bazzel's inability to determine whether Thomas would have regained *complete* neurological function after an earlier surgery does not prevent him from opining that she would have had more function than she currently has.

While the SHP Defendants point out potential factual weaknesses in Dr. Bazzel's opinion, including that Thomas's numbness had previously been misdiagnosed by the same hospital where she ultimately underwent surgery, (Doc. 94 at 2, 5), those arguments go to weight, not admissibility, and may be properly raised during cross-examination. *See McLean*, 224 F.3d at 801. The SHP Defendants' Motion to Exclude Dr. Bazzel's Testimony will be denied.

#### iv.   *Nurse Kathryn Crous*

Nurse Kathryn Crous was retained by Thomas to opine on EMR and information technology ("IT") systems in a healthcare environment. (Doc. 95-3, Crous Report at 3; Doc. 113 at 2). Her opinions focus on "indicators and evidence of inappropriate medical record alteration in Ms. Thomas's records" which she

concluded could suggest poor document management procedures or "nefarious intent" on the part of the SHP Defendants. (Doc. 95-3, Crous Report at 4). The SHP Defendants argue that Nurse Crous's opinions should be excluded in their entirety. (Doc. 95 at 1). They contend that her opinions are not couched in any degree of probability because they are not based on sufficient facts and data and that her opinions would be unhelpful to the trier of fact because they would confuse the issues. (*Id.*).

First, the SHP Defendants point out that Nurse Crous's testimony is limited to general statements that they had the opportunity to alter or fabricate Thomas's medical records, but that she is unable to state, with any degree of probability, whether those records actually were altered or fabricated. (*Id.* at 5-6). Further, even if the SHP Defendants did alter Thomas's records, Nurse Crous cannot determine whether they did so because of any "nefarious intent." (*Id.* at 6).

Indeed, Nurse Crous testified that she couldn't say with complete certainty whether Nurse Troendle lied or had nefarious intent with regard to a refusal note that was created outside the EMR system. (Doc. 102-1, Crous Dep. at 45:21-46:11; Doc. 113 at 5). However, she did note that the record was "more likely than not, self-serving to show better attention to care for Ms. Thomas was provided than occurred." (Doc. 95-3, Crous Report ¶ 7). With respect to a sick-call slip entered by Nurse Collins, Nurse Crous

similarly testified that "[i]t could have been fabricated" but she couldn't "say for sure what [Nurse Collins's] intent was." (Doc. 102-1, Crous Dep. at 59:7-13).

Nurse Crous also noted that, with regard to records that had been deleted by Head Nurse Thoman, "there's no way you can know what was deleted." (*Id.* at 74:16-19; Doc. 113 at 6). However, she also testified that she could not say, to a reasonable degree of certainty whether Thomas's EMR was modified in any way and that she did not "have evidence that [the record] was fabricated," but that it was her opinion that it was "possible to modify [it]." (*Id.* at 75:14-24). She also noted that she had no evidence that any handwritten documents in Thomas's medical record were altered and that she didn't know whether any SHP providers acted with nefarious intent. (*Id.* at 33:1-5, 33:25-34:6).

The Sixth Circuit has held that "the 'knowledge' requirement of Rule 702 requires 'more than subjective belief or unsupported speculation' . . . ." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590). In *Tamraz*, the Sixth Circuit noted that where an expert's "opinion contains not just one speculation but a string of them," that expert's testimony may cross the line from knowledge to prohibited speculation. *Id.* at 672. In that case, the expert hypothesized a link between an environmental toxin and Parkinson's Disease, but the Sixth Circuit noted that there was also a "leap of faith"

required to get from the expert's hypothesis that a toxin *could have caused* an illness to his conclusion that it *did cause* the plaintiff's illness. *Id.* at 670-71.

Similarly, here, Nurse Crous's testimony includes several "speculative jumps." She points to evidence in the audit trail of the CorrecTek record, including that dictation locks were taken off of Thomas's records, that Head Nurse Thoman deleted and appended various documents, that certain SHP employees accessed Thomas's records after she had been transferred to the hospital, that some records were created outside the standard CorrecTek template, and that there were inconsistences in the audit trail regarding "printing" and "access" functions. (Doc. 95-3 ¶¶ 1-4, 7-23, 35-31). However, none of this evidence indicates anything more than that the SHP Defendants *could have* altered Thomas's medical records.

Nurse Crous's opinion then takes one more speculative jump: these potential alterations could have been due to poor document management practices or they could have been caused by "nefarious intent" on the part of the SHP Defendants. This jump is particularly large because "[a] party's 'state of mind' is subjective and cannot be within [an expert's] knowledge." *See ISP Chems. LLC v. Dutchland, Inc.*, No. 5:08-CV-153, 2011 WL 2651691, at *7 (W.D. Ky. July 6, 2011) (citing *Johnson v. Baker*, No. 1:08-CV-00038, 2009 WL 3486000, at *5 (W.D. Ky. Oct. 23, 2009)).

While Thomas argues that the portions of Nurse Crous's deposition cited by the SHP Defendants only reflect her opinions as to certain documents within the overall medical record, Thomas has not pointed to any evidence establishing that Nurse Crous's opinions as to the other documents are based on different facts. (*See* Doc. 113 at 4-10, 14-15). On the contrary Nurse Crous's report notes that "Corre[c]Tek does not audit to the level of detail to ascertain exactly what was changed or deleted at a discrete level." (Doc. 95-3, Crous Report ¶ 23). Accordingly, she cannot opine as to what, if any, changes were made to individual documents.

Thomas also points out that Nurse Crous "believes that the only reason to remove the dictation lock on medical records is so that someone could alter the records while hiding the alterations." (*Id.* ¶¶ 27-28; Doc. 113 at 15). However, Nurse Crous's subjective belief does not equate to the knowledge required by Rule 702. *See Daubert*, 509 U.S. at 590. Neither Thomas nor Nurse Crous have pointed to any evidence to indicate anything regarding the reason that the dictation lock was taken off of Thomas's EMR and unsupported speculation is prohibited by Rule 702. Accordingly, because Nurse Crous cannot state, to any degree of certainty, whether the SHP Defendants did alter Thomas's medical records or, if they did, why they did so, she will not be permitted to introduce those opinions to the trier of fact.

However, the SHP Defendants do not dispute that Nurse Crous reviewed the audit trail of Thomas's CorrecTek medical record and that evidence, combined with her knowledge and experience in the EMR and IT fields, led her to the conclusion that the SHP Defendants had the opportunity to alter the records. Thus, Nurse Crous will be permitted to explain to the jury what the information in the audit trail means in practical terms, including that removing a dictation lock means that the records could be altered without leaving audit trail data, that certain SHP employees accessed Thomas's records after there was no longer a medically necessary reason for them to do so, and that certain records were not created contemporaneously with the events they describe. The jury may then draw its own conclusions as to the credibility of the CorrecTek record and what motivated the SHP Defendants' conduct.

Second, the SHP Defendants argue that Nurse Crous's testimony would be unhelpful to the trier of fact and would confuse the issues before the jury. (Doc. 95 at 10-11). However, a jury tasked with rendering a verdict in this matter would necessarily need to review Thomas's CorrecTek medical record and assess the credibility of the statements it contains in order to determine what risks the SHP Defendants were aware of and what information they had about Thomas's medical condition. Accordingly, Nurse Crous's testimony regarding the potential inaccuracies in Thomas's

medical record would assist the jury to determine the appropriate weight of the statements it contains.

Although the SHP Defendants do not dispute that Head Nurse Thoman deleted some documents, there is a dispute as to whether the deleted records were retained by the CorrecTek system and produced in discovery. (Doc. 102-1, Crous Dep. at 74:9-19; Doc. 113 at 14). Nurse Crous's testimony will thus also assist a jury to resolve that dispute.

However, Nurse Crous's opinion that SHP employees violated the Health Information Portability and Accountability Act (HIPAA), (*see* Doc. 95-3, Crous Report ¶ 3), fares differently. Thomas's deliberate indifference claim is not based on a HIPAA violation and penalties for such a violation are imposed by the Secretary of Health and Human Services, not via a private right of action. *See Pitchford v. Metro Nashville Police Dep't*, No. 3:19-CV-00256, 2021 WL 2474461, at *3 (M.D. Tenn. June 17, 2021) (collecting cases).

Under Federal Rule of Evidence 403, a court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading a jury. Thomas argues that Nurse Crous's opinion regarding HIPAA is probative because it is evidence that the SHP Defendants were inappropriately accessing Thomas's medical record and it provides support for her contention that the SHP Defendants were altering

the records rather than examining them for a legitimate purpose. (Doc. 113 at 16).

However, the probative value of the evidence can still be obtained via testimony that there was no reason related to Thomas's care for the SHP Defendants to access her medical record after she was transferred to the hospital. Specific testimony that such post hoc access is a HIPAA violation would be prejudicial to the SHP Defendants and could incorrectly lead a jury to conclude that it should hold them liable for their purportedly illegal conduct, even if that conduct does not meet the elements of Thomas's deliberate indifference claim. Thus, Nurse Crous may not testify that the SHP Defendants' conduct constitutes a HIPAA violation.

The SHP Defendants' Motion to Exclude Nurse Crous's Testimony will be granted as to her opinions regarding whether any SHP employee altered Thomas's medical records, the intent behind the SHP Defendants' actions, and whether their conduct violated HIPAA. The SHP Defendants' Motion will be denied as to Nurse Crous's conclusions regarding what the information in the audit trail means and whether the SHP Defendants had the opportunity to alter Thomas's medical records.[24]

---

[24] Although Nurse Crous's opinions were discussed in connection with the analysis of the SHP Defendants' Motion for Summary Judgment, none of the excluded opinions form the basis of the Court's decision.

*v.   Ms. Alyssa Rhodes*

Ms. Alyssa Rhodes is an expert in digital forensics who was retained by the SHP Defendants to offer opinions on the audit trail for Thomas's CorrecTek medical records. (Doc. 111 at 1). Thomas argues that her testimony should be stricken because she is not qualified as an expert regarding electronic medical records and her opinions unreasonably rely on inadmissible hearsay. (Doc. 92 at 1-2).

The Sixth Circuit "take[s] a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the [Rule 702] requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208-09 (6th Cir. 2015) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)). Ms. Rhodes has an Associate's Degree in Information Technology with a concentration in Network Security and Digital Forensics and a Bachelor's Degree in Computer Forensics in Digital Investigations. (Doc. 91, Rhodes Dep. at 5:20-6:1). She has also been certified as a Digital Forensics Certified Associate by the Digital Forensics Certification Board. (*Id.* at 7:17-23).

Ms. Rhodes works with databases and logs, such as the audit trail in this case, "quite frequently" and has specifically worked with medical records on one prior occasion. (*Id.* at 13:4-14). Her prior work on EMR data involved similar content and the only

difference between that case and Thomas's case was that the information was saved in different formats. (*Id.* at 35:25–36:13).

Thomas cites *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), for the proposition that Ms. Rhodes cannot offer expert opinion testimony on the specialized topic of HIPAA-compliant EMR systems. (Doc. 92 at 5–6). In *Berry*, the Sixth Circuit held that there was no foundation upon which an expert could opine as to the effects disciplinary shortcomings would have on the future conduct of thousands of police officers even though he was purportedly an expert in "police policies and practices." 25 F.3d at 1352. That expert, the court noted, had degrees in sociology and education and had been appointed a deputy sheriff, but admitted his position did not require qualifications and that he never received formal training. *Id.* at 1348.

However, here, Ms. Rhodes was formally trained in the field of digital forensics. Unlike in *Berry*, where the expert attempted to testify regarding specific aspects of a police department's conduct and its future effects, here it is undisputed that Ms. Rhodes will not be offering an opinion on the substance of Thomas's medical records. *See* 25 F.3d at 1352. Instead, she will explain how the audit trail reflects potential changes in those records. (*See* Doc. 92-1, Rhodes Report at 11). Her education and experience in the field of digital forensics allow her to offer an opinion as

to digital records and the alterations they may contain, regardless of the subject matter contained in those records.

Although Thomas notes that Ms. Rhodes is not versed in HIPAA-compliant systems, (Doc. 92 at 6), as discussed above, whether CorrecTek or the SHP Defendants complied with HIPAA is not at issue and is not the subject of an opinion that Ms. Rhodes has offered or intends to offer at trial. Similarly, Ms. Rhodes's lack of experience building, designing, testing, or educating end users on EMR systems, (*see id.* at 4), does not mean that she is not qualified to opine on the audit trail of such a system. That she has authored a blog post on cell phone data retrieval, (*see* Doc. 91, Rhodes Dep. at 9:17-24), also does not mean that she is only qualified to opine on topics in that specific area of digital forensics.

While Ms. Rhodes was unaware of the particular CorrecTek settings used at KCDC and did not "dig into" errors in the audit trail, (*see id.* at 28:17-19; Doc. 92-1, Rhodes Report at 9), any weaknesses in the factual basis of her opinions are the proper subject of cross-examination because they bear on weight, not admissibility. *See McLean*, 224 F.3d at 801. The Court finds that Ms. Rhodes is qualified to offer expert opinions on the audit trail of Thomas's CorrecTek medical record.

Thomas also argues that Ms. Rhodes's opinions must be excluded because they are based, in part, on conversations that she had with Burton Ulrich ("Ulrich"), who designed the CorrecTek system

93

and is the company's current CEO. (Doc. 92 at 7-8; Doc. 111 at 9). However, Federal Rule of Evidence "703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994). Although experts must reasonably rely on the kind of evidence that other experts in the field would rely on, Thomas does not argue that other digital forensic analysts reject evidence obtained from statements by a system's designer. *See* F. R. Evid. 703.

That the parties dispute whether CorrecTek has a "dictation lock" function is not a basis for excluding Ms. Rhodes's testimony but is instead grounds for "[v]igorous cross-examination [and] presentation of contrary evidence . . . ." *See Daubert*, 509 U.S. at 596. Accordingly, just as discussed above, any weaknesses in Ms. Rhodes's opinions that originate from her decision to rely on Ulrich's statements go to weight, not admissibility. *See McLean*, 224 F.3d at 801.

Therefore, Thomas's Motion to Strike Ms. Rhodes's Testimony will be denied.

### vi. Dr. Jeffrey Wang

Dr. Jeffrey Wang is a board-certified orthopedic spine surgeon who was retained by the SHP Defendants to offer opinions on whether their conduct met the standard of care, the atypical

94

presentation of Thomas's spinal abscess, and whether earlier surgical intervention would have changed her neurological outcome. (Doc. 99-1, Wang Report ¶¶ 1-2; Doc. 112 at 1). Thomas argues that Dr. Wang's testimony should be stricken in its entirety for three reasons: (1) it is unreliable; (2) the probative value of his testimony is substantially outweighed by the danger of unfair prejudice; and (3) it contains improper credibility determinations. (Doc. 99 at 2).

First, Thomas acknowledges that "there is no denying that Dr. Wang brings advanced specialized knowledge of spine care that a jury of lay persons would lack," but argues that his testimony should be excluded because he lacks experience in correctional facilities. (*Id.* at 2, 7). Dr. Wang testified that, although he does not specialize in correctional medicine, it is his opinion that he "could make a clinical scenario diagnosis whether the patient was on the beach or in my office or in their home, based on the clinical information." (Doc. 96, Wang Dep. at 61:1-25). He acknowledged his lack of familiarity with the standards of care specific to correctional settings but based his opinions on the standard of care for spine conditions. (*Id.* at 87:15-88:1).

In *Sanford v. Stewart*, a court in the Northern District of Ohio dealt with a similar argument. No. 5:11-CV-2360, 2013 WL 3729175, at *3-4 (N.D. Ohio July 12, 2013). There, the court held that a physician's lack of familiarity with correctional standards

may be raised during her cross-examination but was not a basis to disqualify her from testifying as to what medical standards require of interactions between nurses and doctors. *Id.* Although Thomas argues that Dr. Wang's opinions are broader than the expert's opinions in *Sanford*, (Doc. 129 at 5-6), the underlying reasoning in that case is nonetheless instructive.

Just as in *Sanford*, here, Dr. Wang's lack of expertise regarding the specific standards applicable to medical professionals in a correctional setting does not prohibit him from testifying as to what the standards of spine care require of medical professionals, regardless of setting. That none of the SHP Defendants are spine surgeons does not preclude his testimony either, as his opinions are based on the medical standard of care for spine conditions generally, not the standard of care specific to any one type of medical professional. Thomas may raise Dr. Wang's lack of experience in the field of correctional medicine and any attendant weaknesses in his testimony during his cross-examination.

Thomas also contends that Dr. Wang's testimony is unreliable because he failed to consider certain evidence, including the video of Thomas being moved from the wheelchair to the observation cell, Dr. Suetholz's testimony that he never viewed Thomas's chart, SHP's policies and procedures, the declarations of other inmates, and the statements in the medical records regarding Thomas's IV drug

96

use. (Doc. 99 at 4, 6, 8, 14-16; Doc. 129 at 6). However, as discussed above, any weaknesses in the factual basis of Dr. Wang's opinions are the proper subject of cross-examination because they bear on weight, not admissibility. *See McLean*, 224 F.3d at 801.

Thomas does not dispute that Dr. Wang reviewed her medical records and the testimony of the SHP nurses, among other documents. (*See* Doc. 99-1, Wang Report ¶ 4). Although Thomas argues that Dr. Wang's opinions are not supported in his report, (Doc. 99 at 9), Dr. Wang's report does provide the basis for his opinions, including his analysis of the symptoms recorded in Thomas's medical records and when, based on his knowledge and experience, those symptoms became consistent with a spinal abscess. (*See* Doc. 99-1, Wang Report ¶¶ 6-13). Dr. Wang has applied a reliable method to sufficient facts and he can thus offer an opinion on whether the SHP Defendants' conduct met the standard of care for Thomas's condition.

Thomas also argues that Dr. Wang's testimony at trial should be limited to the opinions expressed in his report. (Doc. 99 at 10-11). In support of this argument, Thomas points to Dr. Wang's deposition testimony, which contains a general statement that he does not intend to testify regarding the opinions of any other experts in this matter, but that, if their opinions differed from his, he would support his own opinions. (Doc. 96, Wang Dep. at 31:4-32:18). However, this is not a basis for limiting his

testimony. Dr. Wang has offered opinions, which are based on his experience and education in the field of spinal medicine in addition to the facts of the case, and he has stated that he intends to properly stand behind those opinions at trial. Thomas has not established that Dr. Wang's opinions are unreliable under the standard of Rule 702.

Second, Thomas argues that the Court should exclude Dr. Wang's testimony under Rule 403 because its probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, and wasting time. (Doc. 99 at 11-13). In support of this argument, Thomas points to the potentially confusing distinction between the standard of care and the reasonableness of one's actions under that standard of care. (*Id.* at 12).

However, the Sixth Circuit has opined that expert testimony on the standard of care is not only admissible in deliberate indifference cases but is often *required* to establish causation. *See Phillips v. Tangilag*, 14 F.4th 524, 538-39 (6th Cir. 2021) (internal citation omitted). Accordingly, Dr. Wang's testimony is extremely probative to the SHP Defendants' argument that Thomas's injuries were not caused by their conduct. That probative value is not substantially outweighed by any danger that the jury might be confused by the difference between the medical standard of care and the deliberate indifference standard.

Moreover, the fact that "standard of care" may be a legal phrase does not mean that an expert's opinion including that phrase ultimately expresses a legal conclusion. Indeed, here, Dr. Wang has not offered an opinion on the ultimate issue a jury must decide: whether the SHP Defendants acted with deliberate indifference to Thomas's serious medical need.

Similarly, Thomas's argument that Dr. Wang has only testified as a defense medical malpractice expert and has only opined that medical professionals have met the standard of care, (Doc. 99 at 12-13), may be raised as attacks on his credibility during his cross-examination, but are not bases to conclude that his testimony would be substantially more prejudicial than it is probative. Further, that Dr. Wang was unsure "what level of detail" some of Thomas's deposition questions necessitated, (Doc. 96, Wang Dep. at 10:9-18), does not mean that his trial testimony would be confusing for a jury. Any issues regarding the scope of specific questions may be properly addressed during trial at the time those questions are asked. The Court will not exclude Dr. Wang's testimony under Rule 403.

Finally, Thomas argues that Dr. Wang should be prohibited from making credibility determinations. (Doc. 99 at 13-16). Indeed, the Sixth Circuit has held that "[e]xperts may not testify about the credibility of other witnesses." *Smith v. Jones*, 721 F. App'x 419, 423 (6th Cir. 2018) (citing *Greenwell v. Boatwright*,

184 F.3d 492, 496 (6th Cir. 1999)). Dr. Wang testified that he did not consider all of Thomas's statements to be true "[b]ecause there are a lot of facts in the . . . records that question her credibility . . . or her truthfulness." (Doc. 96, Wang Dep. at 36:3-15). The SHP Defendants argue that Dr. Wang has not made improper credibility determinations but has instead limited his opinion to the undisputed fact that Thomas made inconsistent reports of her medical history. (Doc. 112 at 14).

Dr. Wang may not testify as to Thomas's credibility or truthfulness because those determinations must be made by the jury. However, that is not a basis to exclude the entirety of his testimony. *See Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). Dr. Wang may testify to the inconsistencies in Thomas's medical record and how those inconsistencies might impact the diagnostic process without offering an opinion as to Thomas's credibility.

Similarly, although Dr. Wang testified that he did not review the declarations of the other inmates, (Doc. 96, Wang Dep. at 36:16-38:6), he may not opine on their credibility either. But, as the SHP Defendants note, he may testify that there are inconsistencies between those declarations and other evidence, including video footage and Thomas's testimony. (*See* Doc. 112 at 14).

In sum, Thomas's Motion to Strike Dr. Wang's Testimony will be granted as to any credibility determinations but otherwise denied.

### *Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) The Deputy Defendants' Motion for Summary Judgment (Doc. 83) be, and is hereby, **GRANTED**;

(2) The SHP Defendants' Motion for Summary Judgment (Doc. 98) be, and is hereby, **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion;

(3) The Deputy Defendants' Motion to Strike the Opinion of Nurse Goehring (Doc. 84) be, and is hereby, **DENIED AS MOOT**;

(4) The SHP Defendants' Motion to Exclude the Testimony of Dr. Bjerke (Doc. 93) be, and is hereby, **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion;

(5) The SHP Defendants' Motion to Exclude the Testimony of Dr. Bazzel (Doc. 94) be, and is hereby, **DENIED**;

(6) The SHP Defendants' Motion to Exclude the Testimony of Nurse Crous (Doc. 95) be, and is hereby, **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion;

(7) Plaintiff's Motion to Strike the Testimony of Ms. Rhodes (Doc. 92) be, and is hereby, **DENIED**;

(8) Plaintiff's Motion to Strike the Testimony of Dr. Wang (Doc. 99) be, and is hereby, **GRANTED IN PART** and **DENIED IN PART** consistent with this opinion; and

(9) Defendants Michaela Bone, Katelyn Bradford, Anissa Earl, Glenna Knight, Lakin Matthews, Jeanette Molen, Tatiana Robinson/ "Correction Officer Ellis," David Suetholz, James Todd Collins, and Shawnee Thoman be, and are hereby, **DISMISSED** from this matter.

This 9th day of June 2023.



Signed By:

_**William O. Bertelsman**_  W0B

**United States District Judge**

102